2005 SD 51

**Tamara K. LUKE, Individually, and as the Trustee of the Elmer Stevenson Trust, Plaintiff and Appellee,**

v.

**Clara STEVENSON, Jennifer Sampson Heltzel, and Jason Sampson, Defendants,**

**and**

**Andrea Brown and Gerard Hehn, Defendants and Appellants.**

**Nos. 23285, 23286.**

Supreme Court of South Dakota.

Considered on Briefs March 21, 2005.

Decided April 27, 2005.

---

Thomas E. Alberts, Avon, South Dakota, Attorney for plaintiff and appellee, Tamara K. Luke.

Kenneth W. Cotton, Wagner, South Dakota, Attorney for defendant and appellant, Andrea Brown.

Glenn L. Roth, Olivet, South Dakota, Attorney for defendant and appellant, Gerard Hehn.

Christopher M. Braley, Parkston, South Dakota, Attorney for appellee, Angela Brown.

MEIERHENRY, Justice.

[¶ 1.] This is a consolidated appeal from a declaratory judgment action and involves the interpretation of provisions in a trust document. The issues are whether a great-grandchild born after the trust was created should be included as a beneficiary and whether the beneficiary who was to receive a life estate in a portion of the trust is entitled to equalization of distributions previously advanced to other beneficiaries. The trial court included the after-born great-grandchild as a beneficiary and ruled the life estate beneficiary was not entitled to equalization. We reverse in part and affirm in part.

## PROCEDURAL BACKGROUND AND FACTS

[¶ 2.] Elmer Stevenson created the "Elmer Stevenson Trust" on August 8, 1990. The original assets of the revocable trust included real estate located in Hutchinson County and Bon Homme County. Elmer died approximately two years after creating the trust. Subsequent to his death, several questions arose concerning the interpretation and administration of the trust agreement. These questions were presented to the trial court by way of a complaint for declaratory judgment filed by Tamara Luke, the trustee of the trust.[1] A declaratory judgment trial was held on May 21, 2003. The trial court issued its order and this appeal followed.

[¶ 3.] The issues in this consolidated appeal all arise from disputes over the meaning of certain provisions within the trust agreement relating to the disposition of the trust property and the income derived therefrom. The beneficiaries of the trust consist of the primary beneficiary, Clara Stevenson, and a number of secondary beneficiaries. The first disputed portion of the trust agreement relates to the secondary beneficiaries and reads:

1. This trust agreement was also the subject of a prior opinion of this Court. *See In re Estate of Stevenson*, 2000 SD 24, 605 N.W.2d 818. In that case we held that the trustee improperly engaged in self-dealing by leasing the trust property to her husband and her husband's cousin, and that because of this, the leases were void.

The secondary beneficiaries of the Elmer Stevenson Trust are my son-in-law, Gerard Hehn, my granddaughter, Tamara Kay Brown, and my minor great-grandchildren, namely: Jennifer Sampson, Jason Sampson and Andrea Brown. At the time of the execution of the trust agreement in 1990, Elmer's only great-grandchildren were the three named in the above trust provision.[2] However, a fourth great-grandchild, Angela Brown, was born in 1991, after the trust's creation. The parties dispute whether Angela is included as a beneficiary pursuant to this trust provision. The trial court found that she is a beneficiary. It did so by concluding that the secondary beneficiaries of the trust agreement are the great-grandchildren as a class; and since Angela is a member of the class, she is a beneficiary.

[¶ 4.] A second dispute arises from a distribution provision in the trust agreement that provides for equalizing distributions among the secondary beneficiaries. To acquire an understanding of the equalization provision and its implications, the provision must be read in the context of the entire trust document. Initially, the trust directs that after Elmer's death, the trustee[3] was to pay the income of the trust to Elmer's spouse, Clara Stevenson, who was the primary beneficiary. During Clara's life the trustee was also to distribute to Clara and the secondary beneficiaries "as much of the principal of the Trust as the Trustees deem necessary or advisable for their education, health, maintenance and support." Pursuant to this provision, the trustee made various distributions to the secondary beneficiaries, with some beneficiaries receiving more than others.

[¶ 5.] Upon Clara's death, the trust property was to be distributed according to further provisions of the trust agreement. This brings us to the provision in question, which reads as follows:

> After the death of my spouse [Clara], the Trustee shall, to the greatest extent possible, equalize distributions to the beneficiaries. Any distribution to or for a beneficiary shall be charged against the ultimate share distributable to such beneficiary or those taking through such beneficiary upon termination of the Trust.

[¶ 6.] Gerard Hehn, as a secondary beneficiary, argues that this provision entitles him to receive "an amount equal to the amount that the other secondary beneficiaries were previously advanced or distributed by the trustee during the lifetime of Clara Stevenson." The trial court ruled that he was not entitled to an equalization distribution, finding that the equalization provision did not relate to Gerard's interest in the trust. Gerard also filed a Motion for Reconsideration and Motion for New Trial. In support of the motions, Gerard argued that his testimony as to Elmer's intent in creating the trust and its equalization provisions should be taken and considered. The trial court denied the motions.

## ISSUES

1. Whether the trial court erred by including the after-born great-grandchild as a beneficiary of the trust.

2. Whether the trial court erred in finding that Gerard was not entitled

---

2. Tamara Brown, now known as Tamara Luke, is Gerard's daughter. The great-grandchildren are all Tamara's children.

3. The trust agreement named Gerard Hehn as sole trustee after Elmer's death. However, Gerard quickly resigned as sole trustee and Tamara Luke was ultimately named as trustee.

to an equalization distribution for amounts previously advanced to other beneficiaries.

3. Whether the trial court erred in denying Gerard's Motion for Reconsideration and Motion for New Trial.

## DECISION

*Inclusion of Angela, an After Born Great–Grandchild, as a Beneficiary*

[¶ 7.] Whether Angela is included as a beneficiary hinges on the following language in the trust: "The secondary beneficiaries of the Elmer Stevenson Trust are . . . my minor great-grandchildren, namely: Jennifer Sampson, Jason Sampson and Andrea Brown." The language first uses general class terminology (i.e.great-grandchildren) to describe the secondary beneficiaries. Then after describing the class of beneficiaries, the agreement immediately lists the beneficiaries by name (i.e. Jennifer Sampson, Jason Sampson and Andrea Brown). The named beneficiaries comprise all members of the class of great-grandchildren existing at the time of the document's execution. However, a fourth great-grandchild, Angela, was born after the execution of the agreement.

[¶ 8.] The court's task is to ensure that the intentions and wishes of the settlor are honored. *See Briggs v. Briggs,* 73 S.D. 500, 506, 45 N.W.2d 62, 65 (1950) ("The sole purpose of the process of construction is to discover the intention of the [settlor]"). In order to determine the settlor's intention, we examine the document as written. "If that intention is clearly manifested by the language of the [trust instrument], it is the duty of this court to declare and enforce it. However, if the language is not clear, construction of an ambiguous trust instrument is a question of law to be decided by the court." *In re Estate of Stevenson,* 2000 SD 24, ¶ 14, 605

N.W.2d 818, 821 (alteration in original) (quotations and citations omitted). Questions of law are reviewed de novo. *Beals v. Wagner,* 2004 SD 115, ¶ 5, 688 N.W.2d 415, 417.

[¶ 9.] The trial court found that the language in the trust agreement was clear and that it unambiguously provided for the great-grandchildren as a class, rather than as individuals. Accordingly, the trial court found that Angela is a beneficiary due to her status as a member of the class. An analysis of the trust language, however, does not clearly support the trial court's conclusion. The agreement initially uses a class designation, but then directly thereafter names the beneficiaries individually. On the one hand, one could logically argue that by specifying the class and then specifically naming all of the living members in the class, Elmer intended to include after-born great-grandchildren in the class. On the other hand, one could legitimately argue that by specifically naming the members, he meant to limit the class to those named. Had he merely identified the class without naming the individuals in the class or had he indicated that any great-grandchildren born thereafter were also included or excluded, there would be no doubt concerning his intention. The manner in which it was written, however, does leave a question as to whether he did or did not intend to include the great-grandchildren born after the trust was established.

[¶ 10.] Since a review of the trust language itself leaves doubt as to Elmer's intent, we may look to rules of construction. *See In re Barrett's Estate,* 70 S.D. 475, 480, 18 N.W.2d 787, 790 (1945) ("Before resort may be had to rules of constructional preference, it must appear that a testator has left room for doubt as to his intention."). One generally recognized rule of construction is that absent an ex-

pression of contrary intent, a gift made to persons identified by name and referred to by relationship is a gift to them individually and not as a class. *See* Vitauts M. Gulbis, Annotation, *Wills: Gifts To Persons Individually Named But Also Described In Terms Of Relationship To Testator Or Another As Class Gift*, 13 A.L.R.4th 978, § 2(a) (1982 & Supp 2004). Considering the language of the trust agreement in conjunction with this basic rule of construction, the trial court's finding that Elmer's intent was to make a gift to the class of great-grandchildren becomes questionable. *Cf. McMahan v. Naylor*, 855 S.W.2d 193, 194 n2 (TexApp 1993) (applying Texas law and stating that "[a]s a matter of law, if a will describes legatees as a class but also identifies them by name or number, then the devise is not one to a class but to individuals."). The further finding that this intent is unambiguously shown by the document itself is error.

■ [¶ 11.] "Language is ambiguous when it is reasonably capable of being understood in more than one sense." *In re* Estate of Brownlee, 2002 SD 142, ¶ 17, 654 N.W.2d 206, 210 (citations and quotations omitted); *see also* BLACK'S LAW DICTIONARY 79 (7th ed 1999) (defining ambiguity as "[a]n uncertainty of meaning or intention, as in a contractual term or statutory provision"). As already discussed above, the agreement's designation of secondary beneficiaries could reasonably be understood to encompass the entire class of great-grandchildren or only the specifically named great-grandchildren. Given the ambiguity in the agreement, we find that it is appropriate to look to the extrinsic evidence of Elmer's intent in exe-cuting the trust agreement. *See In re Estate of Klauzer,* 2000 SD 7, ¶ 10, 604 N.W.2d 474, 477 (stating that when interpreting a will, "[e]xtrinsic evidence is admissible to clarify any ambiguity"). In this case, the extrinsic evidence is compelling and leaves little doubt of Elmer's intent.

■ [¶ 12.] This trust agreement has been the subject of prior litigation. Concerning one of these earlier disputes, a motion hearing was held where testimony was taken from both Elmer's late wife Clara and the attorney who drafted the agreement.[4] The transcript of this hearing was entered into evidence in the present case without objection. The attorney's testimony at the prior hearing was that she had discussed with Elmer the option of including provisions for after-born great-grandchildren in the agreement and that Elmer had rejected the idea. This extrinsic evidence strongly suggests that Elmer's intent was that after-born children were not to be included as secondary beneficiaries. In addition, Elmer's late wife Clara testified that Elmer had discussed with her the possibility of adding Angela's name to the trust agreement after Angela was born. Such a discussion further indicates that Elmer believed that the document he had executed did not provide for after-born great-grandchildren but only those great-grandchildren specifically named in the document.

[¶ 13.] Considering the ambiguous trust agreement and the extrinsic evidence of Elmer's intent, we find that the trial court erred when it concluded that Elmer intended to include Angela as a beneficia-

---

4. The appellant very briefly argued res judicata in her brief on this issue because the issue had been ruled upon at this earlier hearing. However, because this affirmative defense was raised for the first time on appeal and was not presented or argued to the trial court, it has been waived. *Krull v. Jones*, 46 FSupp2d 997, 1002 (D.S.D.1999). *See also Barnard v. Chicago & N.W. Ry. Co.*, 39 S.D. 623, 627, 166 N.W. 148, 150 (1918).

ry. Instead, we conclude that when Elmer created the trust, he intended to include only the named great-grandchildren as beneficiaries. He did not intend to include all members of the class; and although adding Angela was discussed later, he did not do so. The trial court is reversed as to issue one.

*The Trial Court's Application of the UPC*

[¶ 14.] On appeal, the parties argue at length over whether the UPC applies to trust agreements drafted before South Dakota's adoption of the UPC. We need not answer this question because the specific provision the parties attempt to apply is inapposite in this case. Whether or not the UPC might apply in other circumstances is left for another day.

[¶ 15.] When interpreting the trust agreement, the trial court erroneously applied the omitted children provision of the South Dakota Uniform Probate Code (UPC), which is located at SDCL 29A–2–302. Clearly, this statute does not apply to great-grandchildren. The statute refers to "a child born to or adopted by the testator[.]" The UPC's definition of "child" expressly excludes a "grandchild, or any more remote descendant." SDCL 29A–1–201(6). Because this issue is not dispositive, we need not reach the issue of whether the UPC applies to trust agreements drafted before its adoption.

*Equalization Distributions*

[¶ 16.] The trust provides for both discretionary distributions and mandatory distributions of specific sums. The mandatory distributions consist of the distribution of all income to Clara during her life, a life estate in half the trust assets to Gerard after Clara's death and the ultimate distributions to Tamara and the three great-grandchildren at the termination of the trust. The discretionary distributions allowed by this trust can be categorized into two groups. First, there are the discretionary distributions that could be made before Clara's death. These distributions were to come from the principal of the trust assets and could have been made to Clara, Gerard, Tamara, and/or the three great-grandchildren. Second are the discretionary distributions to be made after Clara's death. These could be made only from the income of trust assets and only to Tamara and the three great-grandchildren.

[¶ 17.] The current dispute arose as a result of the discretionary distributions of principal that were made before Clara's death. While the trustee made numerous and significant discretionary distributions during this time, only one relatively small distribution was made to Gerard. Gerard now claims that he is entitled to equalization in connection with these disproportionate distributions. He bases this assertion on the final paragraph of Article IV of the trust. The entire Article IV reads as follows:

During Settlor's life, the Trustees shall dispose of the net income and principal of the Trust in such manner as the Settlor may direct from time to time. Unless otherwise directed by the Settlor, the net income shall be paid to the Settlor at least quarter annually.

Additionally, during any period when, in the opinion of Settlor's personal physician or pursuant to a Court determination Settlor is incompetent, incapacitated or disabled due to an illness, age or other cause, with resulting inability to manage property and affairs effectively, the Trustees shall pay to or apply so much of the net income and principal of the Trust as in the Trustees sole discretion shall be necessary or advisable for the health, support, maintenance and general welfare of the Settlor.

Upon the death of the Settlor, the Trustees shall pay to or apply for the benefit

of Settlor's spouse, Clara, during the term of her life, the entire net income of the Trust in convenient installments, at least quarter annually. However, in the event the Settlor's spouse should so decide, she may waive the right to receive said installments. The Trustees shall also pay to or apply for the benefit of Settlor's spouse and the beneficiaries herein as much of the principal of the Trust as the Trustees deem necessary or advisable for their education, health, maintenance and support. The Trustees shall, at all times, give primary consideration to the Settlor's spouse with regard to the distribution of principal under this Section.

The Trustees shall be mindful that the Settlor's primary concern and objective is to provide for the welfare of the designated beneficiaries, and the preservation of the principal is not as important as the accomplishment of said objective. Therefore, in making discretionary distributions, the Trustees shall consider any income or other resources of the beneficiaries outside the Trust and known to the Trustees.

After the death of my spouse, the Trustee shall, to the greatest extent possible, equalize distributions to the beneficiaries. Any distribution to or for a beneficiary shall be charged against the ultimate share distributable to such beneficiary or those taking through such beneficiary upon termination of the Trust.

The trial court found that the equalization provision in the last paragraph relates only to discretionary distributions made after Clara's death and does not implicate Gerard's interest in the trust.

[¶ 18.] We interpret the meaning of the equalization provision in context with the other provisions in Article IV. *See Hill–Taylor Co. v. Shade,* 57 S.D. 357, 362, 232

N.W. 89, 91 (1930) ("intention must be deduced, not from specific provisions or fragmentary parts of the instrument, but from its entire context, from all its provisions taken together"). Generally, Article IV relates to how trust distributions are to be made during the existence of the trust. It proceeds in a sequential fashion. It addresses how distributions are to made (1) while Elmer is alive, (2) after his death but while Clara is alive, (3) after Clara's death and (4) upon final distribution after Gerard's death. The following detailed breakdown of Article IV helps illustrate its sequential construction.

[¶ 19.] Under the first two paragraphs of Article IV, while Elmer was alive he was to direct the distributions of net income and principal. The third paragraph directs that after Elmer's death the trustees were to pay Clara all the net income "in convenient installments." The trustees were also allowed to invade the principal for the benefit of Clara as well as the other beneficiaries if the trustees determined it "was necessary or advisable for their education, health, maintenance and support." The fourth paragraph concerns these discretionary distributions and clearly sets forth that Elmer's first priority was "to provide for the welfare of the designated beneficiaries," not preservation of principal. The trustee was to make the "discretionary distributions" keeping in mind "any income or other resources of the beneficiaries outside the Trust and known to the Trustees." This provision clearly indicates that such distributions were not required to be equal and could be dispersed depending on the beneficiary's need.

[¶ 20.] The final paragraph, which is the one on which Gerard relies, directs that: *"[a]fter the death of my spouse,* the trustee shall, to the greatest extent possible, equalize distributions to the beneficia-

ries." (Emphasis added.) Elmer specifically outlined sequential scenarios based on whether he or Clara or neither was living at the time. Each scenario required a distinct method of handling distributions. Given the sequence of the provisions in Article IV and the language of the provision itself, it is logical to conclude that the final paragraph relates only to discretionary distributions made after the death of the spouse. Discretionary distributions made before Clara's death are not subject to equalization.

[¶ 21.] This interpretation is also consistent with the equalization provision's further direction to charge any distribution "against the ultimate share distributable to such beneficiary ... upon termination of the trust." Pursuant to the terms of the trust agreement, ultimate distribution of the assets of the trust does not occur until after Gerard's life estate is terminated by his death. After Gerard's death, these assets are to be distributed to the remaining beneficiaries of the trust. No ultimate distribution can be made until after Gerard's death and neither Gerard or his estate is entitled to any distribution at that time. In other words, upon the termination of the trust Gerard has no "ultimate share" against which a prior distribution could be charged.[5] Only Tamara and the great-grandchildren are entitled to distributions when the trust terminates. Since, unlike Gerard, these secondary beneficiaries are entitled to an ultimate share, the trial court reached the correct conclusion when it determined that the equalization provision (and its interrelated direction to charge distributions against ultimate

shares) applies only to Tamara and the great-grandchildren. Such an interpretation is consistent with the entire context of the instrument. *See Hill–Taylor Co.*, 57 S.D. at 362, 232 N.W. at 91.

[¶ 22.] Particularly, this interpretation is bolstered by the language of Article VI of the trust, which further describes what is to happen upon Clara's death. This paragraph requires the estate to be divided in half after Clara's death: one half as a life estate to Gerard, one half to the remaining beneficiaries. It provides:

> Upon the death of the Settlor and Settlor's spouse, the Trust estate shall be divided so that Gerard Hehn, the Settlor's son-in-law, shall have a life estate in and to one-half (1/2) of the Trust assets. The other one-half (1/2) of the Trust shall be used for the benefit of the remaining beneficiaries as much of the net income as Trustees deem necessary or advisable for their education, health, maintenance and support.

This provision allows the Trustee to make discretionary distributions to the "remaining beneficiaries" (i.e. not Gerard) after Clara's death. These are the distributions that are subject to Article IV's direction to equalize if possible and to charge against the ultimate share of each beneficiary without exception.

[¶ 23.] The trial court's finding that Elmer's intent was for Tamara and the great-grandchildren to have the distributions they received after Clara's death equalized is logical and provides internal consistency to the agreement.[6] Therefore, we affirm the trial court as to this issue.

---

**5.** Gerard received a small distribution prior to Clara's death. Therefore, if Elmer's intent was that the distributions made prior to Clara's death were to be equalized to the extent possible and charged against the beneficiary's ultimate share, Elmer was directing the trustee to do the impossible. That is,

charge the discretionary distribution made to Gerard against his non-existent ultimate share.

**6.** Gerard contends that when interpreting the trust agreement, the court should consider statutes relating to a trustee's fiduciary duties.

*Motion for a New Trial*

[¶ 24.] Gerard's motion for a new trial concerned the trial court's finding that the equalization provision of the trust agreement did not apply to Gerard's interest in the trust. In support of this motion, Gerard offered his own affidavit. The affidavit does not assert or contend that Gerard has any extrinsic knowledge or evidence of Elmer's intent in drafting the equalization provision. The affidavit asserts only that distributions were made from the trust to secondary beneficiaries prior to Clara's death. The fact that unequal distributions were made prior to Clara's death provides no further guidance in determining whether Elmer intended such distributions to be equalized. The standard of review for trial court's denial of the motion for a new trial is abuse of discretion. *Border States Paving, Inc. v. State*, 1998 SD 21, ¶ 11, 574 N.W.2d 898, 901. The trial court's denial of these motions was not an abuse of discretion.

[¶ 25.] The trial court is reversed as to Issue 1 and is affirmed as to Issues 2 and 3.

[¶ 26.] GILBERTSON, Chief Justice, and SABERS, KONENKAMP and ZINTER, Justices, concur.

See SDCL 55–1A–30, –33 & SDCL 55–3–5. However, these statutes address the powers and duties of the trustee. They do not provide rules of construction.