#26722-a-SLZ

**2013 S.D. 89**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

IN THE MATTER OF
SUNRAY HOLDINGS TRUST.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE  SIXTH JUDICIAL CIRCUIT
SULLY COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE JOHN L. BROWN
Judge

* * * *

ROBERT M. RONAYNE
THOMAS J. COGLEY of
Ronayne & Wein, LLP
Aberdeen, South Dakota                    Attorneys for appellants
                                          Lee and Linda Shoup.


WILLIAM M. VAN CAMP, JR. of
Olinger, Lovald, McCahren
  & Reimers, PC
Pierre, South Dakota                      Attorneys for appellee
                                          Gregory Shoup.



PAUL E. BACHAND of
Schmidt, Schroyer, Moreno,
  Lee & Bachand, PC
Pierre, South Dakota                      Attorneys for appellee
                                          Larry Shoup.

* * * *

CONSIDERED ON BRIEFS
NOVEMBER 4, 2013

OPINION FILED **12/11/13**

#26722

ZINTER, Justice

[¶1.] Lester and Harriet Shoup created an inter vivos trust. After their deaths, their only children, Gregory and Larry Shoup, moved to terminate the trust. They argued that the trust only provided for Lester and Harriet during their lives and there was no trust provision directing disposition of the remaining trust assets. Therefore, they contended that the trust had fulfilled its purpose. Lee and Linda Shoup, Gregory's children, objected. They argued that the trust had not fulfilled its purpose. They contended that two letters found with the original trust document instructed on the disposition of trust assets. Following a non-evidentiary hearing, the circuit court terminated the trust. We affirm.

*Facts and Procedural History*

[¶2.] Lester and Harriet had two children, Gregory and Larry. In 1993, without the assistance of a lawyer, Lester drafted a trust document titled, "Sunray Holdings." The trust named Lester and Harriet as the "Trustor." It named Lester, Harriet, Gregory, and Larry as "Co-Trustees."

[¶3.] Lester died in 2008, and Harriet died in 2012. After Harriet's death, Gregory opened a safe-deposit box rented by the trust. The safe-deposit box contained a manila envelope, which contained the original trust document and a smaller sealed envelope. The smaller envelope had the following handwritten note on the front: "Instructions for Sunray Holding Trust to be opened on death of grantors [sic] Lester Shoup & Harriet Shoup 4/22/94."

[¶4.] The smaller envelope contained a two-page handwritten letter ("1994 letter") signed by Lester and Harriet. The letter instructed the trustees on a variety

-1-

of matters, including compensation for Gregory for managing the trust and cash payments for Gregory, Larry, Lee, and Linda. The 1994 letter also indicated: "After eight years the trust can be divided if it is the best business decision at that time. Larry 1/3 Greg 1/3 Lee 1/6 and Linda 1/6."

[¶5.] The manila envelope also contained a one-page handwritten letter titled, "Sunray Holdings Trust Instructions 11/05/07" ("2007 letter"). The 2007 letter stated that the distribution of trust income should be as follows: "Greg 30% – Larry 30%[,] the remaining 30% will be divided between Linda and Lee." The 2007 letter also directed certain lump-sum payments and referred to Lee and Linda as "co-trustees." There were no signatures on the 2007 letter. The words "Signed by" were written at the bottom but were crossed out. The 2007 letter did not mention the ultimate disposition of trust property.

[¶6.] Gregory, as trustee, petitioned the circuit court to interpret, construe, and issue instructions directing the trustees on proper administration and distribution of the trust. Gregory also sought the court's instructions regarding the letters.

[¶7.] After filing the petition, Gregory and Larry, acting individually, moved to terminate the trust under SDCL 55-3-23(2). They contended that the trust only provided for Lester and Harriet during their lives and there was no trust provision disposing of trust property upon their deaths. Therefore, Gregory and Larry contended that the trust had fulfilled its purpose and should be terminated, leaving the assets to pass by will or intestate succession.

[¶8.] Lee and Linda, however, argued that "the Trust was not silent as to what [was] to occur upon the death[s] of Lester and Harriet[.]" Lee and Linda relied on one phrase in one sentence of trust Article I(D). That phrase gave the trustees certain powers to "hold, invest, disburse, deliver, or otherwise dispose of trust property and proceeds according to written instructions." Lee and Linda argued that this language "clearly indicate[d] that Lester and Harriet contemplated the need for further instruction[,]" and the 1994 and 2007 letters constituted such instructions. Because Lee and Linda claimed that the letters were contemplated by the trust, they also argued that the letters were not amendments or substantial changes to the trust.

[¶9.] Gregory and Larry disagreed, arguing that the letters substantially changed the trust. According to Gregory and Larry, Article I(D) only empowered the trustees to make investment dispositions upon written instructions, and it did not authorize the final disposition of trust property by written instructions upon the deaths of Lester and Harriet. Therefore, Gregory and Larry contended that, if given effect, the letters amended or changed the trust. They also pointed out that the trust explicitly prohibited "substantial changes" without the written consent of all trustees, and they had not consented. They relied on Article I(A), which provided: "This Trust Agreement, and the duties and liabilities of the Co-Trustees shall not be substantially changed without the Co-Trustees written consent."

[¶10.] The circuit court agreed with Gregory and Larry. The court noted that the trust did "not contain any language relating to the . . . disposition of the trust asset[s] upon the death[s] of both [Lester and Harriet]." Therefore, the court

concluded that the letters substantially changed the trust, "and absent written consent of the Co-Trustees, any modifications of the Trust pursuant to the [letters were] not enforceable." Because Gregory and Larry did not consent to the letters, the court ruled that: the letters had no effect, the trust had served its purpose, and the trust terminated upon Harriet's death.

[¶11.]    Lee and Linda appeal, arguing that the circuit court misinterpreted the trust. Trust interpretation is a question of law reviewed de novo. *In re Schwan 1992 Great, Great Grandchildren's Trust*, 2006 S.D. 9, ¶ 11, 709 N.W.2d 849, 852 (citations omitted).

*Decision*

[¶12.]    Lee and Linda first argue that the letters did not change the trust. They contend that the letters were part of the trust because they were authorized by the phrase in the second sentence of Article I(D) that referred to certain dispositions by written instructions of the trustors. They claim that the letters "flow naturally from Article I(D) and are a recognition that the Trust was never meant to terminate upon the second death."

[¶13.]    Gregory and Larry acknowledge the phrase in the second sentence of Article I(D). But they contend that the phrase, interpreted in context, only related to trustee investment powers. Because there is no trust provision directing the disposition of assets after the deaths of the trustors, Gregory and Larry contend that Lee and Linda are seeking to change the trust by extrinsic evidence (the letters) in violation of Article I(A).

[¶14.]      When presented with a trust instrument, our "task is to ensure that the intentions and wishes of the [trustor] are honored." *In re Florence Y. Wallbaum Revocable Living Trust*, 2012 S.D. 18, ¶ 20, 813 N.W.2d 111, 117 (quoting *Luke v. Stevenson*, 2005 S.D. 51, ¶ 8, 696 N.W.2d 553, 557).  To carry out a trustor's intentions and wishes, we first "look to the language of the trust instrument." *In re Schwan*, 2006 S.D. 9, ¶ 12, 709 N.W.2d at 852 (citation omitted).  "If the *language of the trust* instrument makes the intention of the [trustor] clear, it is our duty 'to declare and enforce it.'" *In re Florence Y. Wallbaum Revocable Living Trust*, 2012 S.D. 18, ¶ 20, 813 N.W.2d at 117 (emphasis added) (quoting *Luke*, 2005 S.D. 51, ¶ 8, 696 N.W.2d at 557).

[¶15.]      To determine whether the letters constituted a substantial change requiring trustee approval under Article I(A), we must first determine whether the second sentence of Article I(D) authorized the final disposition of trust assets by letters.  Article I(D) provided:

> For so long as Trustor remains physically and mentally competent to make decisions in respect to investment of the trust estate or until Trustor directs otherwise, Trustor shall retain all rights, options and privileges to vote any stock and to withdraw, sell, convert, invest, reinvest, deal in and deal with any property as security for loans; and this Trust shall include at any time only that property and the proceeds thereof placed in said Trust and then remaining therein.  *Co-Trustees shall hold, invest, disburse, deliver, or otherwise dispose of trust property and proceeds according to written instructions.*  All written notices and communications received by Co-Trustees shall be delivered forthwith to Trustor.  All securities not in bearer form shall be registered in name of nominee, as Trustor may direct in writing.

(Emphasis added.)

[¶16.]     When read in context, Lee and Linda's reliance on the second sentence of Article I(D) is misplaced.  The topic sentence of Article I(D) reflects that the paragraph was intended to deal with the allocation of power between the trustors and trustees regarding "investment of the trust estate."  Consistent with that sentence, the third and fourth sentences addressed the management of investments.  Concededly, one phrase in the second sentence, if read in isolation, stated that the trustees could "dispose" of assets according to written instructions.  But the rest of the second sentence dealt with the management of investments; i.e., the holding, investing, disbursing, and delivering of trust property.  Therefore, when considered in context of the entire paragraph, the disposition phrase in the second sentence must be read to have only contemplated the trustors' written instructions regarding investment dispositions of the trust estate.  The second sentence did not contemplate the ultimate disposition of trust assets upon the trustors' deaths.

[¶17.]     The purposes of Article I and Article II further support this conclusion.  Article II was the only article that addressed the disposition of trust assets.  The article was titled: "Disposition Provisions."  But Article II was limited to directing the disposition of trust property during Lester's and Harriet's lifetimes.  It contained no provision directing the disposition of trust property upon their deaths.

[¶18.]     Similarly, no part of Article I provided for the disposition of trust assets upon the trustors' deaths.  The title of Article I reflects that it only dealt with "Powers Reserved by Trustor."  It specified various powers reserved by the trustors and indicated the events upon which those powers could be exercised by the trustees.  Consistent with the other provisions of Article I, Article I(D) directed that

-6-

the trustors retained the power to manage the trust's investments until incapacity or until they elected to transfer that power to the trustees. And if the trustors elected to transfer the investment power, the second sentence then empowered the trustees to invest and manage the trust estate according to the trustors' written instructions.

[¶19.]    Considering the second sentence of Article I(D) in context, the circuit court correctly concluded that the trust did "not contain any language relating to the . . . disposition of the trust asset[s] upon the death[s] of both [Lester and Harriet]." Because the trust contained no disposition provision that took effect upon their deaths, the court correctly concluded that the letters, if given effect, would substantially change the trust.

[¶20.]    Lee and Linda, however, cite *In re Estate of Kirk*, 907 P.2d 794 (Idaho 1995), to support their claim that the trust and letters should be construed together as one trust document. The Idaho Supreme Court explained: "Idaho has . . . recognized the general rule of construction that when two or more instruments are being considered, they should be construed as a whole in order to determine the intent of the parties." *Id.* at 804 (citations omitted).

[¶21.]    We have recognized a similar rule of construction, but we disagree with its application in this case.* Before we resort to rules of construction, we must

---

\*    *See Baker v. Wilburn*, 456 N.W.2d 304, 306 (S.D. 1990) ("[W]hen two or more instruments are executed at the same time by the same parties, for the same purpose and as part of the same transaction, the court must consider and construe the instruments as one contract." (alteration in original) (citation omitted)); *id.* ("[I]t is not critical whether the documents were executed at exactly the same time or whether the parties to each agreement were

(continued . . .)

-7-

first find that the trust's language is ambiguous. *See Luke*, 2005 S.D. 51, ¶ 10, 696 N.W.2d at 557. In this case, neither party argues that the trust's language is ambiguous. Furthermore, in *In re Estate of Kirk,* handwritten notes were given effect in part because an amendment to the trust allowed for changes by such notes. 907 P.2d at 804. In this case, there was no trust provision that allowed for dispositions by letters. Lee and Linda's reliance on *In re Estate of Kirk* is inapposite.

[¶22.]     Lee and Linda alternatively argue that, even if the letters would substantially change the trust, Gregory's and Larry's consent as trustees was unnecessary. Lee and Linda argue that, at the time the letters were written, Gregory and Larry were not yet empowered to act as trustees. Linda and Lee contend that under Article I(F), Gregory's and Larry's authority to act as trustees did not come into effect until Harriet's death. We disagree.

[¶23.]     As is relevant here, Article I(F) provided:

> The Co-Trustees shall assume full and complete investment control and responsibility with respect to the trust estate or any portion thereof so directed in writing by the Trustor or upon the happening of one of the following events:
>
> . . . .
>
> 3. Upon the date of Trustor's death.

---

(. . . continued)

   identical."); *Kramer v. William F. Murphy Self-Declaration of Trust*, 2012 S.D. 53, ¶ 14, 816 N.W.2d 813, 816 ("Where several writings are connected by internal references to each other, even if they were executed on different dates and were not among all of the same parties, they will constitute a single contract as long as they involve the same subject matter and prove to be parts of an entire transaction." (citation omitted)).

Lee and Linda correctly point out that under this provision, certain trustee powers did not come into effect until the trustors' written direction or until the deaths of the trustors. But their argument fails to recognize that this limitation on powers applied only to the trustees' power of "investment control and responsibility with respect to the trust estate[.]" Article I(F) did not limit any other power or responsibility of the trustees. Therefore, Article I(F) did not deprive the trustees of their non-financial management powers—e.g., the power to consent to substantial changes to the trust in accordance with Article I(A).

[¶24.] We acknowledge that this poorly drafted trust was written by Lester without the assistance of counsel. But Lester and Harriet, as trustors, are deemed to have selected the trust's language for a reason and understood its effect. *See In re Trust of Cross*, 551 N.W.2d 344, 347 (Iowa Ct. App. 1996) (applying this principle to a will) ("We . . . assume the testator selected the language adopted to express his meaning and he knew and appreciated the effect of the language used[.]" (citations omitted)). Therefore, we interpret the words used by Lester and Harriet *in the trust*, and we do not consider extrinsic evidence or rules of construction unless the trust's language is ambiguous. *See Luke*, 2005 S.D. 51, ¶¶ 10-11, 696 N.W.2d at 557-58 (citations omitted). Because the trust is not ambiguous, we only "declare and enforce it" without reference to rules of construction or the extrinsic evidence of the letters. *See id.* ¶ 8 (quoting *In re Estate of Stevenson*, 2000 S.D. 24, ¶ 14, 605 N.W.2d 818, 821).

[¶25.] The Sunray Holdings trust document contained no language directing the disposition of trust assets upon Lester's and Harriet's deaths. Further, the

trust's language did not authorize the final disposition of trust assets through letters. Therefore, the circuit court correctly determined that the letters, if given effect, would substantially change the trust, but that change was prohibited because the trustees did not consent in writing. Accordingly, the circuit court correctly concluded that the trust had fulfilled its purpose and should be terminated.

[¶26.] GILBERTSON, Chief Justice, and KONENKAMP, SEVERSON, and WILBUR, Justices, concur.