#29745-aff in pt & rev in pt-MES
**2023 S.D. 44**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

IN THE MATTER OF THE
FRED PETERSEN LAND TRUST

IN THE MATTER OF THE
FRED PETERSEN LIVING TRUST

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE THIRD JUDICIAL CIRCUIT
MOODY COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE PATRICK T. PARDY
Judge

* * * *

RONALD A. PARSONS, JR.
PAMELA R. REITER
ANTHONY P. SUTTON of
Johnson, Janklow, Abdallah &
   Reiter, LLP
Sioux Falls, South Dakota

Attorneys for appellants
Michael and Sally Johnson.


JOHN A. SHAEFFER
Flandreau, South Dakota

Attorney for appellee Mindy
Smith.


DANNY R. SMEINS
Britton, South Dakota

Attorney for appellee Jody
Wallin.

* * * *

ARGUED
MAY 26, 2022
OPINION FILED
NOVEMBER 23, 2022
REHEARING GRANTED AND
OPINION WITHDRAWN
AUGUST 18, 2023
OPINION FILED **08/18/2023**

SALTER, Justice

[¶1.]	Prior to his death in 2018, Fred Petersen created two trusts. After Fred's passing, one of his daughters, Sally Johnson, filed separate petitions seeking court supervision and reformation of one of the trusts. Another of Fred's daughters, Mindy Smith, opposed the reformation of the trust and filed her own petition seeking clarification from the court and requesting other relief.

[¶2.]	The circuit court conducted a two-day court trial to determine the merits of the petitions. In its memorandum decision, the court granted Sally's request to reform the trust and denied each of Mindy's requests for relief. Sally then sought reimbursement from the trust for her attorney fees and expenses incurred during the litigation. The circuit court denied the request, concluding the trust did not receive an economic benefit from the litigation, which, the court determined, was required to justify reimbursement from the trust. Sally has appealed this denial. We affirm in part, reverse in part, and remand.

## Facts and Procedural History

[¶3.]	Fred Petersen farmed and raised cattle in Moody County for many years. His farm consisted of approximately 1,000 acres of crop and pasture land, including a twenty-acre homestead with outbuildings, a cattle yard, and a farmhouse where Fred and his family lived. At one point, the farm was valued at nearly six million dollars.

[¶4.]	Fred and his first wife were divorced in what appears to have been the late 1970s. Prior to the divorce, they had three daughters together: Jody, Mindy, and Sally. As they grew older, Jody and Mindy left the farm and moved out of

state.[1] Sally, however, remained. She and her husband, Mike Johnson, lived one mile from the homestead and helped Fred on the farm.

[¶5.] In 1997, Sally and Mike rented all the crop ground from Fred and farmed it themselves. When Fred retired from farming altogether, Sally and Mike took over the cattle operation as well. Though Fred continued living on the homestead after his retirement, Sally and Mike began making farm-related improvements to the property with the understanding—expressed to them by Fred—that they would inherit the homestead after his death.

[¶6.] Marital tension between Fred and his second wife, Sharon Petersen, prompted Fred to create the Fred Petersen Living Trust. The Living Trust was a revocable trust prepared by Thompson Law in Sioux Falls and was funded with all of Fred's real and personal property. Fred named himself as the initial trustee with Fred and Sharon as the income beneficiaries. Fred selected his sister along with Sally and Mike to serve as successor co-trustees after his death and named his three daughters as successor income beneficiaries.

[¶7.] The Living Trust contained several specific distributions, including Fred's directive to have his twenty-acre homestead surveyed, platted, and distributed to Sally immediately upon his death. The Living Trust instrument also provided an option for Sally and Mike to lease the entirety of the agricultural land from the trust after Fred's death, with rent for the tillable acres calculated at ninety

---

1. Mindy returned to South Dakota in 2010 and lives near Flandreau with her husband.

percent of the county average rental rate.[2] The term of the option was the remainder of Sharon's life plus three years.

[¶8.] In 2013, Sharon initiated a divorce action. During the pendency of the divorce, Fred returned to Thompson Law and amended the Living Trust to remove Sharon as an income beneficiary. He also created a new irrevocable trust, known as the Fred Petersen Land Trust, which he funded with the farm land owned by the Living Trust. Fred named Sally, Mike, and Fred's sister as co-trustees, with Fred as the sole income beneficiary.

[¶9.] In an effort to resolve the divorce without selling the farm, Fred agreed to make a cash payment to Sharon of $800,000. Fred was able to pay $253,000 with available funds, and he obtained a loan to cover the balance. The loan agreement required annual payments over a twenty-year term with the final payment due on December 1, 2033. The debt was secured by a mortgage on the property now owned by the Land Trust.

[¶10.] The trust instrument establishing the Land Trust included several provisions relating to the mortgage, leasing, and the eventual distribution of its corpus. Under its provisions, the mortgage payments due after Fred's death could be made from the rental income received by the Land Trust. Mike and Sally had the option to lease the land, as they had with the Living Trust, at the ninety-

---

2. The county average rental rate was calculated using information published by the South Dakota field office of the United States Department of Agriculture National Agricultural Statistics Service. Information in the record suggests that Fred set the rental rate below the average because he believed the soil quality of the cropland was generally below average for the area, though Mindy has frequently described the rent as "below market."

percent-of-the-average rate on the tillable acres for up to three years after Fred's death or three years after the loan was paid off, whichever occurred later. The Land Trust instrument designated Jody, Mindy, and Sally as income beneficiaries after Fred's death and provided that they would eventually receive all the agricultural land from the Land Trust once the mortgage was paid off and the trust was terminated.

[¶11.] After creating the Land Trust, Fred executed a trustee's deed conveying all the real property from the Living Trust to the Land Trust. However, the deed contained a drafting error. Instead of excepting the homestead that Fred intended to gift to Sally and Mike immediately upon his death, the deed unconditionally transferred the homestead to the Land Trust as part of a larger tract without any reference to the intended distribution of the twenty-acre parcel to Sally and Mike. The attorney who drafted both trusts later acknowledged that this was a mistake and that Fred had always planned to transfer the homestead to Sally and Mike in the same manner described in the terms of the Living Trust.

[¶12.] At the time of his death, Fred had reduced the mortgage balance to approximately $150,000 through periodic additional principal payments. However, the terms of the Land Trust required unanimous agreement among Jody, Mindy, and Sally to continue accelerating the mortgage payments beyond the minimum annual payments.

[¶13.] Jody, Mindy, and Sally met at Thompson Law several times in the months following Fred's death to discuss the implications of his estate plan. During these meetings, the sisters and the trust attorney realized for the first time the

error in the Land Trust, which failed to account for the transfer of the homestead to Sally and Mike. After this, the discussions seemed to focus on two main topics—the fate of the twenty-acre homestead and the pace at which the Land Trust retired its mortgage debt.

[¶14.] At an October 2018 meeting, the sisters each acknowledged it was Fred's intent to give the homestead to Sally and Mike and that they should take the necessary steps to fulfill their father's plan. As for the mortgage, Mindy expressed her desire to use all the Land Trust's income to pay down the mortgage as quickly as possible, which would allow the sisters to vote to terminate the Land Trust and distribute the land among themselves. Despite universal consensus on the homestead issue, the sisters were unable to resolve either matter. A memo drafted by a paralegal at Thompson Law in January 2019, described Sally as "fearful" that Mindy "would not sign off on the [homestead transfer]" if Sally did not agree to accelerate the mortgage payments using all of the Land Trust's income.

[¶15.] On February 4, 2019, the sisters met a final time at Thompson Law to again discuss the mortgage and the homestead. According to two "family stipulation" agreements drafted by the Thompson Law attorney and sent to the sisters after the meeting, the parties discussed the following terms: (1) the homestead would be surveyed and deeded to Sally and Mike as originally intended; (2) the parties would retain additional income from the Land Trust to accelerate the mortgage payments in an amount to be agreed upon at a later date with the unanimous consent of all the beneficiaries; and (3) Sally and Mike would retain an option to rent the tillable farm ground for three years after the satisfaction of the

mortgage at the ninety percent rate and, thereafter, would have an additional seven-year option to rent the ground at one hundred percent of the county average rate.

[¶16.] Jody and Sally each signed the stipulations, but Mindy did not. Further communications among the sisters ceased. Sally and Mindy retained separate counsel, and this litigation followed.

[¶17.] On August 8, 2019, Sally filed a petition for court supervision of the Land Trust, *see* SDCL 21-22-9, and a petition for reformation of the Land Trust to correct the scrivener's error in the trustee's deed, *see* SDCL 55-3-28.[3] Mindy then filed her own petition seeking trustee direction and "other relief[.]" She specifically asked the court to order that the parties cease making mortgage payments from the income of the Land Trust because, Mindy alleged, the mortgage was the obligation of Fred's estate or the Living Trust. Alternatively, Mindy asked the court to reform the Land Trust and remove the requirement of unanimous approval of the beneficiaries to accelerate mortgage payments and order that all Land Trust income be used for that purpose until the mortgage was satisfied.

[¶18.] Sally and Mindy each opposed the relief requested by the other. Despite her earlier acknowledgment of her father's intent, Mindy responded to Sally's petition by claiming it was a "violation of Sally's duty of undivided loyalty to the beneficiaries[.]" Mindy also alleged that Sally was "taking advantage" of her

---

3. Sally, Mike, and the third co-trustee (Fred's sister) also filed a petition requesting court supervision and instructions in the Living Trust. As noted below, these actions were later consolidated by the circuit court. Sally and Mike then executed a temporary release of their powers as co-trustees of the Land Trust during the litigation.

role as a trustee and that Mindy had not been given a "full and fair opportunity to explore and *rebut* Sally's contentions" that Fred intended to give Sally the homestead. (Emphasis added.)

[¶19.] Mindy also filed a motion asking the court to enforce what she alleged to be an earlier oral agreement, in which, Mindy claimed, the sisters had previously agreed to accelerate mortgage payments during their initial discussions at Thompson Law. Sally then alleged that Mindy had violated the Living Trust's "no contest clause" and, therefore, forfeited her right to distributions.

[¶20.] The circuit court consolidated the actions and held a two-day court trial. The court heard testimony from several of the beneficiaries, including Mindy, Sally, and Mike, as well as from a Thompson Law attorney. In its memorandum opinion issued after the trial, the court granted Sally's petition to reform the Land Trust and denied all of Mindy's various petitions and motions. In findings of fact, the court found Mindy was not a credible witness at trial.

[¶21.] Sally subsequently filed a motion for reimbursement of attorney fees and expenses from the Land Trust, citing SDCL 15-17-38, which authorizes a court to "award attorneys' fees from trusts administered through the court[.]" The motion was supported by affidavits from Sally's attorneys and extensive invoices detailing the services rendered throughout the course of the litigation. Sally ultimately sought reimbursement in the amount of $290,066.32. Both Jody and Mindy opposed the motion.

[¶22.] At a subsequent hearing, the parties' arguments focused principally on whether an *economic benefit* to the trust as a result of the litigation was a

prerequisite to recovering attorney fees under SDCL 15-17-38. Initially, Sally alleged that reforming the Land Trust to reflect Fred's intent was a sufficient benefit to recover attorney fees irrespective of the economic implications of the litigation to the trust. However, Sally also advanced an economic benefit argument, using an affidavit from Mike, in which he stated the Land Trust would receive $958,168.50 over the term of the option to lease the land from the trust. Mike also asserted that conveying the homestead to Sally and Mike would relieve the Land Trust of approximately $6,600 in annual upkeep costs, thereby resulting in an additional economic benefit.

[¶23.] Mindy and Jody argued that the litigation resulted in no economic benefit to the trust and, instead, benefited solely Sally and Mike, who received the homestead. Mindy and Jody also disputed Mike's economic benefit theory, asserting that the tillable land could have been leased on the open market for more than the ninety-percent-of-the-average market rate.

[¶24.] The circuit court concluded that to recover attorney fees under SDCL 15-17-38, there must be an economic benefit to the trust. The court further stated "that fulfilling the testator's intent is not a benefit when it comes to determining the attorney's fees." The court found that although the litigation "benefited [Sally] individually" that benefit did nothing "in the way of helping other beneficiaries." The court also found that extending the lease option to Mike at the ninety percent rate did not benefit the trust and that "the value of the trust was [not] increased" as a result of the litigation. Therefore, the court denied Sally's motion.

[¶25.]     Sally has appealed, asserting the court's ruling that a trust must receive an economic benefit to recover attorney fees from the trust was an error of law. She also claims that the court clearly erred when it found that the litigation did not result in an economic benefit to the trust.

## Standard of Review

[¶26.]     The grant or denial of attorney fees is ordinarily reviewed for an abuse of discretion. *Wagner v. Brownlee,* 2006 S.D. 38, ¶ 17, 713 N.W.2d 592, 598. "An abuse of discretion 'is a fundamental error of judgment, a choice outside the range of permissible choices, a decision, which, on full consideration, is arbitrary and unreasonable.'" *In re Trust Fund of Baumgart,* 2015 S.D. 65, ¶ 27, 868 N.W.2d 568, 575–76 (quoting *Gartner v. Temple,* 2014 S.D. 74, ¶ 7, 855 N.W.2d 846, 850). "[A] trial court's decision based on an error of law can be by definition an abuse of discretion." *In re S.D. Microsoft Antitrust Litig.,* 2005 S.D. 113, ¶ 28, 707 N.W.2d 85, 98 (citation omitted).

[¶27.]     "When reviewing a trial court's award of attorney fees, questions of fact are reviewed under the clearly erroneous standard." *Id.* "A trial court's finding is clearly erroneous if, after reviewing the entire evidence, we are left with the definite and firm conviction that a mistake has been made[.]" *In re Estate of Dokken,* 2000 S.D. 9, ¶ 10, 604 N.W.2d 487, 490–91 (alteration in original) (citation and internal quotation marks omitted).

[¶28.]     "When applying the abuse of discretion standard of review, we must be careful not to substitute our reasoning for that of the trial court." *S.D. Microsoft Antitrust Litig.,* 2005 S.D. 113, ¶ 27, 707 N.W.2d at 98 (citations and internal

quotation marks omitted). "In other words, a fee award is within the court's discretion so long as it employs correct standards and procedures and makes findings of fact not clearly erroneous." *Id.* (cleaned up).

## Analysis and Decision

### *Benefit to a Trust*

[¶29.] In South Dakota, parties generally pay their own attorney fees under what is commonly known as the American rule. *Id.* ¶ 29, 707 N.W.2d at 98; *see also Credit Collection Services, Inc. v. Pesicka*, 2006 S.D. 81, ¶ 6, 721 N.W.2d 474, 476 ("An award of attorney's fees is not the norm." (citation omitted)). However, a court may award attorney fees when permitted under the terms of a contract or when such an award is explicitly authorized by statute. *See In re Estate of O'Keefe*, 1998 S.D. 92, ¶ 17, 583 N.W.2d 138, 142. A motion requesting attorney fees, therefore, "must specify the judgment and the statute, rule, or other grounds entitling the moving party to the award[.]" SDCL 15-6-54(d)(2)(B); *see also Stern Oil Co., Inc. v. Brown*, 2018 S.D. 15, ¶ 44, 908 N.W.2d 144, 157 ("The party requesting an award of attorneys' fees has the burden to show its basis by a preponderance of the evidence." (citation omitted)).

[¶30.] The provisions of SDCL 15-17-38 provide that a court "may award attorneys' fees from trusts administered through the court as well as in probate and guardianship proceedings." But the text of the statute provides no further guidance regarding the circumstances under which such an award is appropriate.

[¶31.] At one time, our decisions held that attorney fee awards under SDCL 15-17-38 in estate and trust cases were authorized "where the attorney's services

have been beneficial to the estate *and* were necessary because of the executor's negligence, fraud or inactivity." *In re Estate of Perry*, 1998 S.D. 85, ¶ 36, 582 N.W.2d 29, 36 (emphasis added) (citation omitted). The rule originated with our decision in *In re Engebretson's Estate*, 68 S.D. 255, 1 N.W.2d 351 (1941), and became known, perhaps predictably, as the two-prong test used to determine requests for attorney fees. *See In re Estate of Hafferman*, 442 N.W.2d 238, 241 (S.D. 1989), *superseded by statute*, SDCL 29A-3-720.

[¶32.] However, we later concluded that the second prong of the test—requiring the attorney services to be necessary because of a fiduciary's negligence, fraud, or inactivity—was improvidently gleaned from the *Engebretson* case. *See Wagner*, 2006 S.D. 38, ¶ 12, 713 N.W.2d at 596. In *Wagner*, we held that the principal rule of *Engebretson* was simply that "an allowance may be made out of the estate of a deceased person for the services of attorneys for beneficiaries where those services were *beneficial to the estate*." *Id.* (quoting *Engebretson*, 68 S.D. at 260, 1 N.W.2d at 353).

[¶33.] Hastening the demise of the two-prong test after "a lengthy and conflicting history regarding [its] applicability[,]" *Wagner*, 2006 S.D. 38, ¶ 13, 713 N.W.2d at 597, was the Legislature's 1995 adoption of the Uniform Probate Code and the enactment of SDCL 29A-3-720. This statute allows a court to "award necessary expenses and disbursements, including reasonable attorney's fees, to any person who prosecuted or defended an action that resulted in a substantial benefit to the [probate] estate." SDCL 29A-3-720.

[¶34.] Under SDCL 29A-3-720's substantial benefit inquiry, we have held "that an estate 'is benefited when genuine controversies as to the validity or construction of a will are litigated and finally determined[.]'" *In re Bickel*, 2016 S.D. 28, ¶ 51, 879 N.W.2d 741, 755 (alteration in original) (quoting *In re Estate of Laue*, 2010 S.D. 80, ¶ 43, 790 N.W.2d 765, 774). We sourced our rationale for this conclusion to a decision of the Supreme Court of North Dakota, which summarized the public policy behind similar fee provision statutes as one that "allow[s] the personal representative, as a fiduciary acting on behalf of persons interested in an estate, to in good faith pursue appropriate legal proceedings without unfairly compelling the representative to risk personal financial loss by underwriting the expenses of those proceedings." *In re Estate of Flaherty*, 484 N.W.2d 515, 518 (N.D. 1992).

[¶35.] But here it is not necessary to determine whether we should extend the substantial benefit rule of SDCL 29A-3-720 from the probate class of cases to the trust context. The original holding set out in *Engebretson* remains the law. It states an accepted rule that we have previously applied in trust cases—attorney fees are permitted where the attorney's services have been beneficial to the estate. *See* 68 S.D. at 260, 1 N.W.2d at 353. The issue we confront here is whether the benefit necessary for an award of attorney fees from a trust under SDCL 15-17-38 must be economic. On this narrow question, we hold the benefit need not be economic and may include reforming a trust instrument to correspond with the intent of the settlor. *See* Restatement (Third) of Trusts § 88, cmt. d. (Am. L. Inst. 2007) ("Ordinarily, [attorney fees] are limited to situations in which the

beneficiary's participation in the proceeding is beneficial to the trust, usually either because of a recovery that benefits the trust's beneficiaries generally (rather than merely the beneficiary in question) *or by clarifying a significant uncertainty in the terms of the trust.*" (emphasis added)).

[¶36.]     Although the formulation of the standard for attorney fees under SDCL 15-17-38 has varied and been clarified over time, we have never required an *economic* benefit.  It is certainly possible that an economic benefit could support an award of attorney fees, but it has no talismanic significance.  *See In re Estate of Hass*, 643 N.W.2d 713, 720 (N.D. 2002) ("To be beneficial, it need not be shown that net tangible monetary advantage was realized or that a money loss was avoided.  The administration of trust property does not permit so simplified a test of 'benefit.'" (citation omitted)).  Rather, a circuit court's decision to grant or deny an application for attorney fees under SDCL 15-17-38 lies within the broad ambit of its discretion so long as the trust estate has benefitted from the underlying litigation.  *See In re Heupel Family Revocable Tr.*, 2018 S.D. 46, ¶ 36, 914 N.W.2d 571, 581 (holding SDCL 15-17-38 "is discretionary"); *Engebretson*, 68 S.D. at 260, 1 N.W.2d at 353 (holding the attorney's services must be "beneficial to the estate").  The conspicuous lack of any statutory restrictions or conditions supports this view.

[¶37.]     Nor do we believe that a party's status as a beneficiary places her at a disadvantage under SDCL 15-17-38.  The plain fact that a party who is a beneficiary derives a benefit from successful litigation involving a trust or will should not detract from a circuit court's focus upon the benefit *to the estate.  See In re Unfunded Insurance Trust Agreement of Capaldi*, 870 A.2d 493, 498 (Del. 2005)

(holding that a court "cannot dismiss the benefits conferred [on the trust] out of hand simply because they flow from litigation motivated by self-interest as a beneficiary"). Indeed, it hardly seems remarkable at all that a beneficiary would, in fact, be benefitted. And where the beneficiary must pursue litigation to obtain the benefit the testator or settlor intended, there may well be a distinct value to the estate. A contrary rule would discourage beneficiaries from pursuing strong claims and undermine the reasonable expectations of individuals who wish to dispose of their property in a way that suits their particular intent.[4]

[¶38.] Here, we conclude the circuit court abused its discretion by denying Sally's motion for attorney fees based on its erroneous view that an attorney fees award under SDCL 15-17-38 "requires" an economic benefit to the trust and that fulfilling the intent of the settlor is not a basis for awarding attorney fees. While the circuit court was certainly permitted to consider economic benefit to the Land Trust in formulating its decision, it should not have treated its absence as a bar to recovery. Nor should it have discounted Sally's efforts to reform the trust to align with Fred's undisputed intent simply because she benefitted from the successful outcome of the litigation. We hold, therefore, that the court was authorized to award attorney fees to Sally under SDCL 15-17-38.

---

4. This is particularly true in cases like this where the intent of the settlor is so clearly undisputed. *See In re Sunray Holdings Tr.*, 2013 S.D. 89, ¶ 14, 841 N.W.2d 271, 274 ("When presented with a trust instrument, our task is to ensure that the intentions and wishes of the trustor are honored." (cleaned up)). We recognize that this is an exceptional case in this regard and that divining intent from extrinsic evidence is often a more complicated endeavor.

*Economic Benefit to the Fred Peterson Land Trust*

[¶39.]     As indicated above, an economic benefit to the trust obtained from litigation can, generally speaking, support an award of attorney fees. Sally alternatively contends under this theory that the Land Trust received additional, purely economic benefit from the litigation and that the court's finding to the contrary was clearly erroneous.[5] She makes two arguments on this point. First, had Mindy been successful in her competing petition to reform the trust, the mortgage payments would have been accelerated, thus shortening Mike and Sally's option to rent the agricultural ground. By succeeding against Mindy, Sally argues that the trust will receive $958,168.50 in rent payments from Mike and Sally over the term of the option. Second, Sally claims that deeding the homestead to her results in a savings of $6,600 per year in upkeep costs that no longer burden the trust. Given our holding above that the reformation of the trust to carry out Fred's intent to transfer the homestead to Sally and Mike could be considered as a benefit

---

5.     Sally argues she should also be eligible for attorney fees for her efforts to resist Mindy's request to modify the trust instrument because Sally was furthering Fred's intent in the same way as she had with her request for reformation relating to the farmstead. But we disagree. Unlike Sally's petition for reformation to conform the trust instrument to Fred's undisputed intent, *see* SDCL 55-3-28, Mindy attempted to modify the trust, alleging the existence of "circumstances not anticipated by the trustor" and the asserted need to "substantially further the trustor's purposes in creating the trust." SDCL 55-3-26. Mindy was unsuccessful but not because Sally persuaded the circuit court that Fred had specifically intended that Sally and Mike should have a lengthy option to rent all of the farm ground. Rather, the circuit court determined that the variable lease option term was anticipated by Fred and expressed in unambiguous terms. In other words, there was no single outcome regarding the ultimate length of the rental option that Fred intended, only scenarios and variations depending upon contingencies over which he had no control.

to the trust, it is unnecessary to consider this latter argument relating to an additional economic benefit that may also be realized as a result of the transfer of the homestead.

[¶40.] As to the former contention about rent payments to the Land Trust, we believe that Sally did not establish any benefit, economic or otherwise, to the trust as it relates to litigating the mortgage payments issue. It does not appear from the record that the rental payments from Mike and Sally were any more beneficial to the Land Trust than would have been the case if the land had been leased to different farmers in the absence of the option. In other words, it does not appear the successful litigation provided the estate with income it could not have otherwise obtained from a different renter. For this reason, the circuit court did not abuse its discretion when it determined that the litigation on this issue did not provide the trust with an economic benefit.

***Appellate Attorney Fees***

[¶41.] Sally and Mike have also requested appellate attorney fees. An award of appellate attorney fees is authorized "only where such fees are permissible at the trial level." *Farmer v. Farmer*, 2020 S.D. 46, ¶ 58, 948 N.W.2d 29, 45 (quoting *Charlson v. Charlson*, 2017 S.D. 11, ¶ 36, 892 N.W.2d 903, 913); *see also* SDCL 15-26A-87.3 (authorizing appellate attorney fees "where such fees may be allowable"). Though we believe the circuit court had authority to grant attorney fees below, we decline to exercise our discretion to grant them here.

**Conclusion**

[¶42.] Attorney fees are authorized in trust supervision proceedings under SDCL 15-17-38 where the litigation has been beneficial to the trust estate. Though the benefit will often be expressed in terms of an economic benefit, the concept is broader than that and can include instances, such as this one, where a beneficiary's litigation was necessary to uphold the settlor's universally acknowledged intent. In those cases where the benefit asserted by an attorney fees applicant *is* economic, the applicant must show that the litigation produced a benefit beyond that which the trust estate would have otherwise realized.

[¶43.] Here, then, attorney fees are authorized for Sally's efforts to vindicate her father's intent. Short of litigation, there was no other means for her to do so. We reverse the circuit court's denial of attorney fees for Sally's litigation efforts to obtain the homestead. However, the circuit court correctly determined that attorney fees were not authorized for Mike and Sally's efforts to resist Mindy's attempt to reform the Land Trust and retire the mortgage debt sooner, and we affirm this determination.

[¶44.] Finally, the plain fact that fees are authorized does not make a fee award a *fait accompli*. *See Ctr. of Life Church v. Nelson*, 2018 S.D. 42, ¶ 34, 913 N.W.2d 105, 114 (holding the fact that a court was authorized to exercise its discretion and award attorney fees did not obligate it to do so). Whether to exercise its discretion to award attorney fees and, if so, in what amount are beyond the issues presented here, and we remand the case for the court to consider these questions.

#29745

[¶45.]       JENSEN, Chief Justice, and KERN, DEVANEY, and MYREN,

Justices, concur.