#27273-a-JMK

**2015 S.D. 65**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

In the Matter of the TRUST FUND
CREATED UNDER THE TERMS OF
THE LAST WILL AND TESTAMENT OF
JOSEPH BAUMGART, DECEASED.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE  FIRST JUDICIAL CIRCUIT
HUTCHINSON COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE GLEN W. ENG
Judge

* * * *

MATTHEW P. BOCK
JAMES A. POWER of
Woods, Fuller, Shultz & Smith, PC
Sioux Falls, South Dakota                    Attorneys for appellants Gloria
                                             Loos, Estate of Louis Hohn,
                                             Evelyn Lang, Virginia Binder
                                             and Gene Loos.


VINCE M. ROCHE
JUSTIN T. CLARKE of
Davenport, Evans, Hurwitz & Smith, LLP
Sioux Falls, South Dakota                    Attorneys for appellees Robert
                                             Bormann and Paul Bormann.

* * * *

ARGUED ON MAY 27, 2015

OPINION FILED **07/22/15**

#27273

KERN, Justice

[¶1.] Petitioners—Gloria Loos, Louis Hohn, Evelyn Lang, Virginia Binder, and Gene Loos—filed suit against Robert and Paul Bormann (Trustees). With the exception of Gene Loos, Petitioners are income beneficiaries of a trust created by Joseph Baumgart. The trust is a court supervised trust. Petitioners sought to reopen previous accountings, remove Trustees, and appoint an independent third-party trustee on grounds of fraud, misrepresentation, material omission, self-dealing, trust mismanagement, and other breaches of fiduciary duties. After an evidentiary hearing on September 12, 2014, the circuit court rejected Petitioners' claims and entered judgement in favor of Trustees. Petitioners appeal. We affirm.

*Facts and Procedural History*

[¶2.] In order to understand the nature of the action before this Court, it is necessary to review the history of the trust. On July 13, 1976, Joseph Baumgart executed his last will and testament establishing a trust for the benefit of his nieces and nephews. He designated his attorney, Henry Horstman, and his banker, Vern Bormann, as the trustees. The trust assets primarily included 920 acres of farmland located in Hutchinson and Douglas Counties of which 873.03 acres were tillable. Baumgart died in 1980, whereupon his nieces and nephews began receiving income from the trust. The income beneficiaries at the time this case was filed were Gloria Loos, Louis Hohn, Evelyn Lang, Virginia Binder, and Lorraine Woodworth. Louis Hohn passed away on October 6, 2014. Lorraine Woodworth did not join this lawsuit. Petitioner Gene Loos is the son of Gloria Loos and, therefore,

is a contingent beneficiary under the trust. Gene also serves as his mother's power of attorney.

[¶3.]     The trust instrument directs Trustees to pay the income from the trust to Baumgart's living nieces and nephews for as long as any niece or nephew lives. Trust income is generated by leasing trust farmland to tenants under one-year, renewable leases. Upon the death of the last niece or nephew, the trust instrument directs Trustees to liquidate the trust's assets and distribute the proceeds to Baumgart's then living grand-nieces and grand-nephews. No grand-niece or grand-nephew is entitled to any distribution from the trust until Baumgart's last niece or nephew dies. Baumgart included strong exculpatory language in the trust instrument, expressly absolving Trustees from any "loss sustained through an error of judgment" and providing that Trustees would only be liable for a loss caused by "willful default."

[¶4.]     The trust has been court supervised for 35 years. The first annual accounting was filed in 1981. Each year, Trustees submitted to the circuit court in Hutchison County an accounting that included a summary of receipts, disbursements, and tax records.[1] Over the years, Trustees sent the income beneficiaries an annual notice of hearing setting forth the date and time when the

---

1.     SDCL 21-22-14 provides:

> Within one hundred twenty days after the expiration of each year from the commencement of court supervision over a trust, the trustee shall file a verified report showing in detail its receipts, disbursements, and acts during the year.

> The trustee may at its election make its annual report during the first four months of any year covering its administration during the preceding year ending December thirty-first.

accounting would be presented to the circuit court. These notices also contained a short document with the legal descriptions of the land owned by the trust, a year-end checking account balance, and a one-page exhibit.[2] From 1993 to 2012, the notices failed to include the legal descriptions of two parcels owned by the trust. The two parcels account for approximately 240 acres of trust property. While the notices did not list the two parcels, the accounting and tax information submitted to the court by Trustees during those years contained all relevant and necessary information for all 920 acres.

[¶5.] Henry Horstman and Vern Bormann, the designated trustees, served the trust for many years. In addition to naming the two initial trustees, Baumgart also named Vern Bormann's sons, Robert and Paul Bormann, as the successor Trustees. Robert was appointed as a co-Trustee in 1989 after the resignation of Henry Horstman, and Paul was appointed as a co-Trustee in 1992 after the death of his father.

[¶6.] For several generations, the Bormann family has owned Farmers State Bank. The main branch is located in Parkston, South Dakota. Baumgart, who was a close, personal friend of Vern Bormann, would often visit Vern at the bank during the final years of his life. During those visits, Baumgart discussed with Vern what he should do with his land after he died. Robert Bormann was also present for several of those conversations. Baumgart personally asked Robert Bormann to

---

2. The one-page exhibits contained a list of total rental income receipts for the year along with the annual expenses. The beneficiaries would not receive a list identifying the tenants, a copy of the leases, or rent charged to the tenants. That information was contained within the trust file and available to the beneficiaries at the Hutchinson County courthouse.

serve as a successor Trustee during one of those conversations. Baumgart instructed Robert Bormann that he wanted the future tenants of the trust land to use responsible farming techniques and to be good stewards of the land.

[¶7.] All trust land is located in the far western portion of Hutchinson County and the eastern portion of Douglas County. The James River divides Hutchinson County into an eastern and western half, and Douglas County is west of Hutchinson. Generally, the land on the western side of the James River in Hutchinson County is less fertile than the land on the eastern side of the River. Douglas County land is typically less fertile and more arid than the land in Hutchinson County.

[¶8.] During his lifetime, Baumgart leased approximately two-thirds of the trust land to the family of Fritz Bialas. Baumgart and Bialas were close friends, and Baumgart even named Fritz's issue as contingent beneficiaries of the trust should none of Baumgart's nieces or nephews have any living issue when the last niece or nephew dies. The remaining one-third of the land consisted of two parcels, one in Douglas County and one in Hutchinson County. The Thuringer family rented the parcel in Douglas County until they ceased farming in 1997. Herbert Koster rented the Hutchinson County parcel. When Baumgart executed the trust instrument, all tenants were customers of Farmers State Bank. Similarly, all of the current tenants are customers of the bank. Until approximately 1999, Farmers State Bank was the only bank located in Parkston.

[¶9.] At the end of 1997, the Thuringer family stopped farming the parcel in Douglas County and allowed their one-year lease to expire.[3] Lorin Schmidt, a farmer who lived close to the land, had inquired of Trustees about the possibility of leasing the Douglas County parcel from the trust a few years before the Thuringers ended their farming operations. Trustees began leasing the land to Schmidt in 1998 because Schmidt was the only farmer to inquire about renting the Douglas County land, and Trustees believed that Schmidt used good farming practices. Prior to entering into a lease with Schmidt, Trustees did not advertise to the public that the land would be available for lease.

[¶10.] In the fall of 1997 and prior to Schmidt leasing the farmland, one of Robert Bormann's sons married one of Schmidt's daughters. Robert Bormann served as Trustee for Baumgart's trust at the time of the marriage. A few years prior to the marriage, Bormann's son and Schmidt's daughter had a child together; thus, Bormann and Schmidt share a grandchild.

[¶11.] Trustees rent the trust land in Douglas County to Schmidt to the present day. Schmidt also leases the trust land in Hutchinson County that was formerly rented by Herbert Koster. Schmidt currently rents 160 acres in Douglas County and 160 acres in Hutchinson County. The remaining 600 acres of trust land are rented to members of the Bialas family.

[¶12.] For most of the trust's existence, Trustees rented the trust farmland on a sharecrop basis, meaning the trust would receive a fixed percentage of the profits

---

3. Trustees routinely entered into one-year, renewable leases rather than multi-year leases given the advanced age of the income beneficiaries and the required liquidation of the trust's assets once the last beneficiary dies.

earned by the tenants at harvest. In 2007, two of the beneficiaries asked Trustees to convert to cash-rent leases to attempt to stabilize the income. Trustees acquiesced, and beginning in 2007, the leases were converted to cash rent. Trustees developed rent values for each of the parcels.

[¶13.] The dispute presently before this Court began with a conversation in the fall of 2012 between Gene Loos and his uncle, Louis Hohn, regarding the trust and its assets. Hohn expressed concern about the income generated by the trust as 2012 had been a drought year. Loos told Hohn that the income had been stabilized because the trust now rented property on a cash-rent basis rather than a sharecrop basis. Hohn still had doubts, but Loos believed the rent was fair on a per acre basis. Loos told Hahn he was under the impression that the trust owned about 680 acres of land. Loos had been calculating the approximate rent per acre by dividing the total rental income by 680 acres instead of 920 acres. Therefore, Loos believed the rental rate per acre was much higher than it actually was. Hohn insisted that the trust owned closer to 900 acres. Loos told Hohn that he would check on the rental rates and how much land the trust owned.

[¶14.] On January 7, 2013, Gene Loos asked the trust's attorney about the total acres owned by the trust. After repeating the request on January 10, 2013, Loos received a reply indicating that the trust owned approximately 900 acres. Loos became concerned that the rental rate per acre was below market value. On January 19, 2013, Loos sent an email as power of attorney for his mother, Gloria, stating that if the trust owned 900 acres, the per-acre rental rate for 2012 would have been approximately $100 per acre, and even lower in previous years. Loos

asked the trust's attorney to provide the rental rates for each parcel of land from 2007 to 2012 and an estimate of the 2013 rent. Loos also asked to be contacted prior to the hearing scheduled for the annual accounting on February 4, 2013.

[¶15.] Robert Bormann called Loos prior to the February 4 hearing. Bormann gave Loos an overview of the trust and its history as well as some background information about Baumgart. Bormann informed Loos that the 2013 rent would not be increased because 2012 had been a drought year.

[¶16.] Over the course of the next seven months, Loos researched agricultural land rental values. Loos believed the proper rental rate per acre should be anywhere between $125 and $300. Loos did not contact Trustees or the trust's attorney again until August 2013. At some point during this time frame, Loos also discovered that Bormann's son was married to Schmidt's daughter. Loos sent an email to Robert Bormann on August 28, 2013, and requested a meeting to discuss the 2014 rental rates. Bormann called Loos that same day. Loos sent a follow-up email on August 30, 2013, asking to meet with Bormann on September 5, 2013. Bormann responded that he would be willing to meet with Loos in the near future to discuss his concerns but that he was unavailable on September 5, 2013. Loos and Bormann did not meet.

[¶17.] Instead, on September 9, 2013, Loos's attorney sent a letter requesting that Trustees resign in exchange for a release from all potential legal claims against them. Loos also requested copies of past accounting information and leases, and directed Trustees to hold off negotiating the 2014 leases. Petitioners sought to remove Trustees and replace them with an independent third-party trustee.

Trustees responded that they would not resign. They also refused to provide copies of past leases, claiming they had no obligation to include beneficiaries in the decision making processes of the trust. On September 18, 2013, however, Trustees provided Petitioners with copies of the 2014 leases after they were negotiated and settled.

[¶18.]        Loos examined the 2014 leases and found that Schmidt was receiving a lower lease rate than the other tenants. Petitioners filed suit in November 2013 alleging fraud, misrepresentation, material omission, self-dealing, trust mismanagement, and other breaches of fiduciary duties. Petitioners also sought to reopen the accountings from 2007 to 2012, to obtain copies of the leases from 2007 to 2013, and to remove the Trustees and replace them with an independent, third-party trustee. Trustees also prayed for damages arising out of alleged trust mismanagement and breaches of fiduciary duties. Trustees denied Petitioners' claims.

[¶19.]        After receiving a formal discovery request on January 21, 2014, Trustees provided copies of the 2007 to 2012 leases. The 2007 to 2012 leases also showed that Schmidt received a lower rental rate. The parties then filed cross-motions for summary judgment. Petitioners contended that the orders approving the 2007 to 2012 accountings were not "final" pursuant to SDCL 21-22-30[4] because

---

4.    SDCL 21-22-30 provides in part:

> An accounting by a trustee of a court supervised trust and the final approval thereof by a court is conclusive against all persons in any way interested in the trust, and the trustee, absent fraud, intentional misrepresentation, or material omission, shall be

(continued . . .)

Trustees had omitted "material information" from their accounting reports, including Bormann's relationship with Schmidt and the inaccurate notices containing legal descriptions for only 680 of the 920 acres.

[¶20.] The circuit court held a hearing on April 21, 2014, and determined that the 2007 through 2012 accountings were in fact missing legal descriptions for two parcels of trust land. The court stated that the issue regarding the missing legal descriptions needed to be addressed before the court could fully resolve either party's motions. The court did, however, grant summary judgment for the 2007 and 2008 accountings because SDCL 21-22-27 barred Petitioners' claims.[5] The 2009 through 2012 accountings remained in dispute. The circuit court otherwise denied the remaining motions for summary judgment.

[¶21.] Both parties renewed their motions for summary judgment following the hearing. In addition, Trustees petitioned to have the 2013 accounting approved. Petitioners objected in part because Trustees continued to lease to Schmidt at a lower rate. On June 17, 2014, the circuit court held another hearing and granted

---

(. . . continued)
> released and discharged from any and all liability as to all
> matters set forth in the accounting.

5.  The 2007 and 2008 claims were barred because the court approved those accountings prior to January 1, 2010. The 2009 accountings were still in dispute because the court did not approve them until January 26, 2010. SDCL 21-22-27 provides in part:

> All decrees of any court of this state made prior to January 1, 2010, settling accounts of trustees or distributing in whole or in part trust estates are hereby legalized, cured, and validated, notwithstanding any defects, omissions, or irregularities in the form of the petition, account, or the notice of the application therefor or in the manner, form, or method of giving or serving such notice.

Trustees' motion for summary judgment concerning the 2009 to 2012 accountings, concluding that the accountings contained no material omissions. The circuit court reasoned that the omission of the legal descriptions for the 240 acres was an inadvertent and unintentional omission and that the tax and accounting information filed with the court properly contained all relevant and necessary information. The circuit court did not address Trustees' failure to disclose Bormann's relationship with Schmidt, or the rental rates charged to individual tenants. The circuit court also denied summary judgment as to the removal of Trustees. The issues relating to the 2013 accounting and Trustees' removal were set for an evidentiary hearing on September 12, 2014.

[¶22.] At the September 12, 2014 hearing, the parties submitted the testimony of witnesses and exhibits concerning the value of the land. Petitioners sought to prove that Schmidt received a preferential rate based on his relationship with Robert Bormann. The evidence showed that Schmidt consistently paid a lower rental rate than the other tenants.[6] However, Trustees submitted evidence that Schmidt's land had a lower soil rating than the other parcels and that Schmidt's parcels typically produced comparable or lower yields than the Bialas parcels. Gene Loos produced evidence and testified that the rental rates charged by Trustees were

---

6.    For example, from 2009 to 2012, Schmidt paid $66.13 per acre for the Douglas County land and $72.25 for the Hutchinson County land. The Bialas family members paid anywhere from $82.31 to $86.25 during that same time span for land in Douglas and Hutchinson counties. Schmidt consistently paid about 10% to 20% less than the Bialases from 2009 to 2014.

significantly below market price.[7] Trustees presented contrary evidence and argued that charging rent at a certain rate was not as simple as looking at an index, but required an analysis of multiple factors.[8] Most importantly, Trustees stressed that Baumgart wanted tenants who were good stewards of the land. Robert Bormann indicated that his primary motive for choosing the tenants he did, including Schmidt, was to honor Baumgart's wishes and select responsible tenants.

[¶23.]      At the conclusion of the hearing and after weighing the testimony and evidence received, the court rendered oral findings of fact and conclusions of law systematically addressing and ultimately denying each of Petitioners claims. The court found that the lower rental rates for Schmidt were not based on Robert Bormann's relationship to Schmidt. The court determined that the relationship did not constitute a personal conflict of interest or self-dealing. With regard to the rental rates, the court held that the rates were not so low as to warrant removal of Trustees. Further, the court noted that there was "a great disparity between the amount of income in one year as opposed to another." The court also found that Petitioners' presentation of data was an attempt to "cherry pick" useful or high-end

---

7.    Loos based his calculations on a survey done by South Dakota State University (SDSU). The 2013 SDSU South Dakota Farm Real Estate Survey listed the average rental rates for nonirrigated cropland in Bon Homme, Hutchinson, and Yankton counties as $170.40, and in Charles Mix and Douglas counties as $125.00. The low-end rent value was $80 and the high-end rent value was $300.

8.    Trustees argued that they used the following factors to determine the proper rental rates: Baumgart's testamentary intent for the land, Trustees' experience, other rental prices in the area of the trust land, historical production of the trust land, soil quality, topography, drainage issues, weather patterns, and USDA documentation of prior rental rates in the two counties.

figures and did not take into consideration the full range of factors, data, and rental information.[9] The court concluded that Trustees did not breach any fiduciary duties or violate any trust responsibilities.

[¶24.] On October 14, 2014, the circuit court entered an order and judgment approving Trustees 2013 annual accounting and dismissing Petitioners' claims. The court also denied Petitioners' request to remove the Trustees. The court incorporated into the judgment its oral findings of fact and conclusions of law from September 12, 2014. Petitioners now appeal to this Court.

[¶25.] Petitioners raise four issues:

    1.    Whether the circuit court erred when it determined that Robert Bormann's relationship to Schmidt did not constitute self-dealing.

    2.    Whether the circuit court abused its discretion when it denied Petitioners' request to replace Trustees with a neutral, third-party trustee.

    3.    Whether the circuit court erred when it ruled there were no material omissions in the accountings.

    4.    Whether the circuit court erred when it denied Petitioners' request for damages.

*Standard of Review*

[¶26.] "Whether a trustee has breached a fiduciary duty is a question of fact." *In re Estate of Moncur*, 2012 S.D. 17, ¶ 10, 812 N.W.2d 485, 487. "We review questions of fact under the clearly erroneous standard of review." *Id.* (quoting

---

9. The circuit court stated:

> The court has examined the figures, and the court finds that the amount calculated by Mr. Loos is not supportable. If you take the high values on everything, you are not going to be able to calculate a valid rental amount.

*Weekley v. Prostrollo*, 2010 S.D. 13, ¶ 11 n.3, 778 N.W.2d 823, 827 n.3). "However, we review purely legal questions de novo, giving no deference to the [circuit] court's findings." *Id.*

[¶27.] We review a circuit court's decision to remove a trustee for abuse of discretion. *See Matter of Estate of Unke*, 1998 S.D. 94, ¶¶ 26 n.4, 29, 583 N.W.2d 145, 150 & n.4; SDCL 55-3-20.1 (providing when a court may remove a trustee). "An abuse of discretion 'is a fundamental error of judgment, a choice outside the range of permissible choices, a decision, which, on full consideration, is arbitrary and unreasonable.'" *Gartner v. Temple*, 2014 S.D. 74, ¶ 7, 855 N.W.2d 846, 850 (quoting *Arneson v. Arneson*, 2003 S.D. 125, ¶ 14, 670 N.W.2d 904, 910).

*Decision*

[¶28.]      *1.*     *Whether the circuit court erred when it determined that Robert Bormann's relationship to Schmidt did not constitute self-dealing.*

[¶29.] Petitioners first argue that Robert Bormann's relationship with Schmidt through a common grandchild created a situation of impermissible self-dealing. The categories of persons to whom a trustee may not lease trust property are expressly defined in SDCL 55-4-13. A trustee is precluded from leasing trust property to a relative, unless expressly authorized to do so by the trust instrument. SDCL 55-4-13. SDCL 55-4-1 defines "relative" as "a spouse, ancestor, descendant, brother, or sister."[10] Bormann and Schmidt are not relatives as defined by statute.

---

10.     We note that 2015 S.D. Sess. Laws ch. 240 amended SDCL 55-4-1 (2012), but the definition of "relative" has remained the same.

[¶30.]    Petitioners rely on *In re Estate of Stevenson*, 2000 S.D. 24, 605 N.W.2d 818, for the proposition that the close relationship between Bormann and Schmidt created a situation of self-dealing.  In *Stevenson*, the trustee executed two leases, one to the trustee's husband and the other to her husband's cousin.  2000 S.D. 24, ¶ 4, 605 N.W.2d at 820.  The primary beneficiary of the trust sought to void the leases, arguing that the trustee committed self-dealing by leasing land to relatives.  *Id.* ¶ 5.  We concluded that the trust instrument did not authorize the trustee to lease property to herself, her husband, or a relative.  *Id.* ¶ 17, 605 N.W.2d at 822.  As the trustee in *Stevenson* was related to her husband and husband's cousin by marriage (i.e., by affinity), we held that the trustee engaged in self-dealing and voided the leases.  *Id.*

[¶31.]    Trustees argue that Bormann and Schmidt are not related in any manner recognized by law, i.e., they are not related by consanguinity (by blood) or affinity.  However, a question arises whether Bormann and Schmidt are related by affinity because their children are married, and they share a common grandchild.  Affinity "is the relationship which one spouse has because of the marriage to blood relatives of another."  *State v. Allen*, 304 N.W.2d 203, 207 (Iowa 1981).  "Each spouse is related by affinity to the blood relations of the other in the same degree as the other, *but the blood relations of one spouse are not, by reason of the marriage, related by affinity to the blood relations of the other*[.]"  *Allen v. Sanders*, 346 P.3d 30, 33 (Ariz. Ct. App. 2015) (emphasis added) (quoting 41 Am. Jur. 2d *Husband and Wife* § 4 (2015)).  Therefore, unlike *Stevenson* where the trustee/spouse was related by affinity to her husband's cousin, 2000 S.D. 24, ¶ 17, 605 N.W.2d at 822, Bormann

-14-

and Schmidt are not related to one another by affinity simply because their children are married.

[¶32.] Petitioners counter that "self-dealing encompasses more than transactions with spouses or blood relatives. It includes any transaction that places a trustee's personal interest in conflict with his obligations to the beneficiaries." Certainly a lack of relationship by blood or affinity does not end the inquiry when a party has alleged that a trustee has engaged in self-dealing. Trustees owe beneficiaries a fiduciary duty of the "utmost good faith[.]" *Id.* ¶ 9, 605 N.W.2d at 821 (quoting *Am. State Bank v. Adkins*, 458 N.W.2d 807, 811 (S.D. 1990)). In order to prevent trustees from "all temptation and to prevent any possible injury to the beneficiary, the rule against a trustee dividing his loyalties must be enforced with 'uncompromising rigidity.'" *N.L.R.B. v. Amax Coal Co., a Div. of Amax, Inc.*, 453 U.S. 322, 329-30, 101 S. Ct. 2789, 2794, 69 L. Ed. 2d 672 (1981) (quoting *Meinhard v. Salmon*, 164 N.E. 545, 546 (N.Y. 1928) (Cardozo, C.J.)).

[¶33.] The circuit court heard competing evidence about whether Trustees breached their fiduciary duty to avoid self-dealing because of Robert Bormann's relationship to Schmidt. Petitioners argued that the lower rate received by Schmidt was a result of his relationship to Robert Bormann because the lease began at about the same time as the marriage, Trustees did not advertise the land when it became available, Schmidt was a customer of the bank, and Trustees did not disclose the relationship to the beneficiaries. Trustees counter that the lower rate was a result of the lower crop yields on the Schmidt parcels, the lower soil ratings, the topography of the land, drainage issues, weather, Trustees' experience of leasing

the land, and other factors.  Furthermore, Petitioners admitted at oral argument that they failed to submit evidence showing that Schmidt received a reduced or lower rental rate than the previous tenants of the same parcels.  We, therefore, hold that the circuit court did not err when it found that Bormann's relationship to Schmidt was not one of blood or affinity and the evidence did not support a charge of self-dealing.

[¶34.]     *2.     Whether the circuit court abused its discretion when it denied Petitioners' request to replace Trustees with a neutral, third-party trustee.*

[¶35.]     The circuit court found that Trustees actions did not meet any of the conditions warranting removal of a trustee pursuant to SDCL 55-3-20.1.  In relevant part, SDCL 55-3-20.1 provides that a qualified beneficiary "may request the court to remove a trustee, or a trustee may be removed by the court on the court's own initiative . . . if: (1) The trustee has committed a serious breach of trust[.]"[11]  Our statutes do not define what constitutes "a serious breach of trust," but our statutes are modelled after the Uniform Trust Code.  *Compare* SDCL 55-3-20.1 (2012) *with* U.T.C. § 706 (2000).  The Uniform Trust Code states:

> [N]ot every breach of trust justifies removal of the trustee.  The breach must be "serious."  A serious breach of trust may consist of a single act that causes significant harm or involves flagrant misconduct.  A serious breach of trust may also consist of a series of smaller breaches, none of which individually justify removal when considered alone, but which do so when considered together.

---

11.     We note 2015 S.D. Sess. Laws ch. 240 amended SDCL 55-3-20.1 (2012) by removing "has committed" and replacing it with "commits."

U.T.C. § 706 (2000), comment on subsection (b)(1). Petitioners again point to Robert Bormann's relationship to Schmidt as evidence of a breach, which was previously addressed.

[¶36.]     Petitioners also point to other alleged breaches, to wit: delay in responding to Gene Loos's request for information regarding historical rental rates; two missed payments, one a tax penalty of $27 and the other a finance charge of $36.38; Trustees submitted erroneous legal descriptions of the land from 1993 to 2012; Trustees only had liability insurance for 680 acres; Trustees own the bank where the funds for the trust are held; Trustees leased property to customers of the bank, which allegedly created a conflict of interest; and Trustees consistently rented the trust land at below market value. Petitioners argue that these minor breaches had a cumulative effect and constituted a serious breach of trust warranting removal of Trustees.

[¶37.]     The determination of whether a breach of trust has occurred is a factual determination, and we will not set aside factual determinations unless they are clearly erroneous. *Moncur*, 2012 S.D. 17, ¶ 10, 812 N.W.2d at 487. The circuit court heard the evidence now presented to this Court and determined that none of the alleged breaches, either individually or combined, constituted a serious breach of trust. Specifically, the circuit court found: in 35 years of trust management, the trust had only incurred $63.38 in fines and late fees, which the court found to be insignificant; the erroneous legal descriptions from 1993 to 2012 were the result of an inadvertent omission; the insurance coverage was also based on the clerical error and that the "liability coverage . . . would still cover [the land] in this instance";

Trustees bank was the only bank in Parkston until 1999; Baumgart was a bank customer; Baumgart knew the Bormann family owned the bank; Baumgart chose the bank and Trustees; and Petitioners attempted to "cherry pick" favorable facts relating to the value of the land. The circuit court also found that the proposed rent values advocated by Gene Loos—who is not an expert in agricultural land value— were not supported by the evidence. Additionally, Baumgart personally selected the successor (now current) Trustees. After review of the record, we cannot say the court erred in making these underlying factual determinations or in concluding that Trustees' alleged breaches did not constitute a serious breach of trust. The circuit court's judgment was not arbitrary or unreasonable and was firmly within its discretion. *See Unke*, 1998 S.D. 94, ¶¶ 26 n.4, 29, 583 N.W.2d at 150 & n.4; SDCL 55-3-20.1. Therefore, we affirm the circuit court and hold it did not abuse its discretion by denying Petitioners' request to remove Trustees.

[¶38.]      3.      *Whether the circuit court erred when it ruled there were no material omissions in the accountings.*

[¶39.]      The circuit court entered summary judgment in favor of Trustees on the issue of whether the 2009 through 2012 accountings submitted to and approved by the circuit court contained any material omissions. "Summary judgment is proper where 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Titus v. Chapman*, 2004 S.D. 106, ¶ 13, 687 N.W.2d 918, 923 (quoting SDCL 15-6-56(c)).

[¶40.]    Petitioners argue that the omission of the legal descriptions from the 2009 through 2012 accountings was a material omission. They submit that a material omission is one that would prevent the court from "being able to satisfy its statutory duty [and] make a detailed examination of Trustees' actions during the past year." Petitioners assert that the omission of the legal descriptions prevented the court from making such an examination. Trustees counter that the court properly entered summary judgment because Trustees submitted an affidavit from the trust's counsel explaining that the omission of the legal descriptions was a clerical error. Further, Trustees argue that Petitioners, including Gene Loos, knew how many acres the trust owned prior to this litigation and, therefore, the omission could not be material.[12] Lastly, Trustees point out that the tax records and other documents submitted with the annual accountings correctly informed the court regarding trust activity.

[¶41.]    The court resolved the motion to reopen the 2009 to 2012 accountings at the hearing on June 17, 2014, wherein Trustees and Petitioners also renewed their motions for summary judgment. Trustees submitted an affidavit from the trust's counsel explaining that the omission of the legal descriptions was not intentional but the result of "an office error made in either a retyping of the descriptions or in cut and paste word processing." The court file showed that all parcels remained in the trust and included annual tax assessments, tax payment receipts, and other documents referencing all the parcels.

---

12.    Trustees elicited testimony from Gene Loos on cross examination that he knew how many acres the trust had because he had a plat map and had driven by each parcel owned by the trust several times.

[¶42.] After hearing the parties' arguments at the June 17 hearing, the court stated that its decision rested on SDCL 21-22-30, which provides:

> An accounting by a trustee of a court supervised trust and the final approval thereof by a court is conclusive against all persons in any way interested in the trust, and the trustee, absent fraud, intentional misrepresentation, or material omission, shall be released and discharged from any and all liability as to all matters set forth in the accounting. For purposes of this section, the term, accounting, means any annual, interim, or final report or other statement provided by a trustee reflecting all transactions, receipts, and disbursements during the reporting period and a list of assets as of the end of the period covered by the report or statement.

The court found "that the 2009 through 2012 accountings are proper, that the inadvertent nonlisting of certain properties does not void the determination that the approval of the accounting is final and therefore cannot be challenged later." The circuit court determined that the omission of the two legal descriptions did not prevent approval of the accounting because the accounting information *itself* contained "all transactions, receipts, and disbursements" for all 920 acres.

[¶43.] Further, the court rejected Petitioners argument that Trustees needed to give the income beneficiaries a more detailed report from 2009 through 2012. The circuit court reasoned, "[T]he way that I read what the [P]etitioners are asking is that they should be handed, in a packet, detailed materials that they would characterize and accept as an accounting. That is not what is required [by the terms of either SDCL 21-22-30 or 21-22-14]." The court explained that instead, SDCL 21-22-30 and 21-22-14 require "that [each accounting] includes the materials" necessary so as to permit review by the court. After examining the accountings submitted to the circuit court, we agree that they contained the necessary

information required under SDCL 21-22-30. We affirm the circuit court's holding that the 2009 through 2012 accountings did not contain any material omissions. The court did not err by determining that no genuine issue of material fact existed on this issue.

[¶44.]     *4.     Whether the circuit court erred when it did not award damages to Petitioners.*

[¶45.]     Petitioners argue that the circuit court erred when it did not award damages based on Trustees alleged breach of fiduciary duties. Petitioners also request removal of the Trustees and appointment of an independent third-party trustee. Because we affirm the circuit court's decision that the Trustees did not breach their fiduciary duties, we need not address this issue.

[¶46.]     For all of these reasons, we affirm the circuit court.

[¶47.]     GILBERTSON, Chief Justice, and ZINTER and SEVERSON, Justices, and SABERS, Retired Justice, concur.

[¶48.]     SABERS, Retired Justice, sitting for WILBUR, Justice, disqualified.