#28721-a-PJD
**2020 S.D. 46**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

JAMES W. FARMER,                                     Plaintiff and Appellant,

    v.

LORI A. FARMER, N/K/A
LORI A. LIEBERMAN,                                  Defendant and Appellee.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SEVENTH JUDICIAL CIRCUIT
PENNINGTON COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE HEIDI LINNGREN
Judge

\* \* \* \*

JAY C. SHULTZ
Rapid City, South Dakota                           Attorney for plaintiff
                                            and appellant.

PATRICIA A. MEYERS
Rapid City, South Dakota                           Attorney for defendant
                                            and appellee.

\* \* \* \*

CONSIDERED ON BRIEFS
JANUARY 13, 2020
OPINION FILED **08/12/20**

#28721

DEVANEY, Justice

[¶1.]     In 2016, Lori Farmer filed a motion in circuit court for an order to show cause why James Farmer should not be held in contempt for his failure to follow the terms and conditions of the parties' property settlement agreement, which was incorporated within their 2014 judgment and decree of divorce. The court held an initial evidentiary hearing on the motion on October 27, 2016 and held numerous hearings thereafter related to continued disputes between the parties. The court held a final evidentiary hearing in January 2018, and in August 2018, issued a judgment and order holding James in contempt and finding that he owes Lori $331,184.81. To satisfy this debt and purge himself of contempt, the court ordered that James convey to Lori his membership interests in certain entities and his ownership interest in certain properties. The court also ordered that James pay Lori's attorney fees. James appeals, and we affirm.

## Factual and Procedural Background

[¶2.]     James and Lori married in 1984 and divorced in January 2014. During their marriage, the couple had purchased a significant amount of undeveloped land in the Black Hills and formed multiple legal entities to develop and sell the land. The companies included: Red Canyon Rim Company (RCRC), The Rim, LLC (The Rim), Lakota Lake Camp, LLC (Lakota Lake), and Iron Mountain Trading Company, LLC (IMTC). In his individual capacity, James formed a land management company—Red Canyon Company (RCC)—to provide marketing and property management services to the above companies. James and Lori also built a cabin on 60 acres of land (cabin property) and used Lori's Equity Institutional

-1-

simplified employee pension plan to acquire an additional 40-acre parcel (Equity 40-acre parcel).

[¶3.] At the time of the divorce, James and Lori had not yet sold all the land owned by their companies, but they desired to continue their plan to sell the properties and share equally in the proceeds of future sales. The parties executed a "stipulation for property settlement agreement" (Agreement) in January 2014 governing the division, management, and sale of their remaining properties. The Agreement also defined how the parties' debts were to be paid or divided. The circuit court incorporated the Agreement into the judgment and decree of divorce.

[¶4.] In July 2016, Lori filed a motion to enforce the judgment and decree of divorce and requested an order to show cause why James should not be held in contempt. Lori asserted, among other things, that James violated the terms of the Agreement as follows: (1) by not first paying their joint debt with the proceeds of land sales prior to paying other expenses or making any distributions; (2) by diluting Lori's membership interest in Lakota Lake through a "cash call" and not equally dividing the distributions from Lakota Lake land sale proceeds; (3) by exceeding the agreed cap on expense limits; and (4) by overpaying his management fees. Lori further alleged that James refused to give her access to the companies' financial records. She requested that the court order an accounting and require James to turn over monthly bookkeeping to an accounting firm.

[¶5.] The circuit court held an evidentiary hearing on the contempt motion on October 27, 2016 and after considering the parties' post-hearing briefs, the court entered findings of fact and conclusions of law on May 1, 2017. The court's findings

identified the properties remaining at the time of the hearing, which included the cabin property, the Equity 40-acre parcel, 10 acres owned by RCRC, 2 tracts owned by Lakota Lake, and 1 parcel owned by IMTC. The court also noted several debts related to the land and cabin for which the parties were personally liable. The court then identified the specific terms of the parties' Agreement that James had violated, found that he had the ability to comply with its terms, and found that his violations were willful and contumacious.

[¶6.] In its May 2017 ruling, the court ordered James to give Lori equal access to the cabin and pay Lori $60,678 as her equal distribution of the proceeds from the sale of a Lakota Lake tract within 90 days of the entry of the court's order. The court further ordered James to refrain from selling or disposing of property in violation of the Agreement and to provide information to an accounting firm for the purpose of determining the amount of increased expense caused by James's management of the companies.

[¶7.] Over the next several months, the parties returned to court frequently and usually in response to Lori's request to require James to comply with the terms of the Agreement and the court's orders. For example, the parties returned to court when James attempted to sell the cabin and tracts owned by Lakota Lake, The Rim, and IMTC by auction without first obtaining, as required by the Agreement, Lori's consent as to sale price, details, and timing of the sale. While the court allowed James to attempt to sell the Lakota Lake tracts and the IMTC parcel at auction, it ordered the parties to mediate their remaining disputes.

[¶8.] After mediation failed and the auction did not occur, the court held multiple additional hearings on motions filed by Lori related to James's continuing actions in violation of the court's orders. As a result of these hearings, the parties agreed to the entry of a restraining order freezing the cabin account as well as the accounts for Lakota Lake, RCRC, and IMTC and prohibiting the "transfers or transactions . . . without the written consent of the other party[.]" James also agreed that the cabin could be listed for sale and that he would produce or release account information related to the intercompany transfers, including information related to his management company, RCC. Finally, the parties agreed to a further evidentiary hearing to resolve the pending contempt order and the division of the remaining land assets. The court entered a written order on October 11, *nunc pro tunc* September 15, 2017, reflective of its oral rulings during the August 3, September 5, and September 15 hearings.

[¶9.] On October 10, 2017, James's counsel obtained permission to withdraw, asserting that James had failed to abide by the attorney fee agreement and that "the attorney client relationship has deteriorated to the point where [counsel] can no longer effectively represent [James]." James ultimately hired new counsel, and the parties scheduled a two-day evidentiary hearing in November 2017 on the contempt issue and division of property. Prior to the evidentiary hearing, Lori submitted proposed findings of fact and conclusions of law, and James submitted a written response in which he proposed a specific division of the remaining real estate, including the real estate owned by the various legal entities.

[¶10.] The evidentiary hearing was rescheduled and held in January 2018. There is no transcript in the record from this three-day hearing. However, it is apparent from the exhibits in the record that Lori presented expert testimony on the valuation of the remaining land assets and property. The record also contains an exhibit offered by James at the hearing relating a proposed division of the remaining land assets.[1] This exhibit contains a series of emails in October and November 2017 between James and First Western Bank in which James explained to his banker that he and Lori had been in court for over a year "in an attempt to settle all remaining issues" and that their focus was "on splitting [their] properties such that [they] each have 100% ownership for half of the remaining land assets." James also indicated that if the parties could not come to their own agreement, the court would "make the split" of the land assets for the parties.

[¶11.] Following the January 2018 hearing, Lori submitted proposed findings of fact and conclusions of law, including a division of "the real property that remains." James also submitted proposed findings and conclusions, but he did not include a specific division of property or object to Lori's proposed property division.

---

1.   The exhibit admitted at this hearing differs from James's proposed division related in his pretrial submissions. In that proposal, James indicated that he would "accept" cash for one-half of his interest in the cabin property and accept two 10-acre lots at The Rim, and two tracts owned by Lakota Lake, whereas his hearing exhibit proposed that Lori would receive the cabin property and the Equity 40-acre parcel, and James would receive two 10-acre lots held by The Rim, the two tracts remaining in Lakota Lake, and one lot in the Canyon Rim Ranch development. James further proposed that he would pay Lori $60,000 "to bridge the difference between [his and Lori's] property allocation values."

[¶12.] On April 19, 2018, the circuit court issued findings of fact and conclusions of law to which James objected, arguing for the first time (and contrary to his pretrial request that the court divide the property) that the court was without authority to divide assets owned by other legal entities. In response, Lori filed a motion for the appointment of a receiver to take possession of the membership interests owned by James in Lakota Lake and IMTC and "take the actions necessary to liquidate and distribute [James's] membership interest in those entities in satisfaction of the Judgment owed to [Lori]." James objected to the appointment of a receiver.

[¶13.] Lori also filed a proposed judgment dividing the remaining land assets consistent with the court's findings and conclusions. James objected, arguing that Lori's proposed judgment violated the prohibition against modifying a division of property in a divorce decree. He also argued that the court did not have jurisdiction or authority to order him to execute and deliver documents that directly or indirectly transferred title to real property owned by LLCs that are not a party to the divorce action. James further asserted (for the first time) that the LLCs are indispensable parties who must be joined in these proceedings in order to transfer such property. In his view, Lori's only remedy in this case would be a money judgment with the right to execute upon the judgment "just like any other judgment creditor."

[¶14.] On July 18, 2018, the court issued amended findings and conclusions. These amendments included additional conclusions that appear to address some of James's objections. The court noted that the parties had created the other legal

entities for the purpose of transferring property and minimizing tax liability. The court also noted that the parties did not designate specific ownership of any particular property in the Agreement; rather they agreed "to sell these properties and divide the proceeds equitably." The court explained that its division of property was a way for James to purge himself of contempt in accord with the "spirit of the equitable division of property" as contemplated in the Agreement.

[¶15.]	In regard to the remaining real estate owned by the parties or held by the various legal entities, the circuit court adopted the expert testimony offered by Lori to arrive at a total value of $1,123,150. After deducting the $253,000 mortgage on the cabin property, the court arrived at a net total value of the properties of $870,150 with an equal division of $435,075 in value for each party. However, the court reduced James's equal share of the remaining marital assets by $331,184.81, the amount he owed Lori because of his contemptuous acts. The court also granted Lori's request for reimbursement of attorney fees and costs, finding that James's conduct substantially increased the amount of time the parties had to appear in court.

[¶16.]	The court entered a separate judgment and order on August 8, 2018 holding James in contempt for violating not only the judgment and decree of divorce, but also the court's multiple orders and directives issued during the contempt proceedings. The court awarded Lori a judgment against James for "$331,184.81 as a result of his willful and contumacious disobedience of the Orders" and ordered James to satisfy this obligation "by transferring" to Lori "certain

ownership interests in entities owned by [James] and additional real estate interests" as delineated in the order.

[¶17.]     After the court issued its judgment and order, James requested an order setting conditions of bond on appeal and a stay pending appeal. The court denied the conditions of bond proposed by James, and instead required that he post a supersedeas bond representing the interest on the judgment in the amount of $101,501.20. The court further ordered James's counsel to deposit the documents transferring the properties, as ordered in the court's judgment, with the Pennington County Clerk of Court pending appeal if the bond was posted by September 10, 2018; however, if the bond was not posted by that date, James's counsel was ordered to deliver the transfer documents to Lori's counsel.[2]

[¶18.]     On September 7, 2018, James filed an objection to the circuit court's bond order. On the same day, he also filed a notice of appeal from the circuit court's August 8, 2018 judgment and order holding him in contempt. In this appeal, James presents multiple issues for our review, which we restate as follows:

1.  Whether the circuit court erred in holding James in contempt.

2.  Whether the circuit court's judgment and order of contempt improperly modified the parties' property settlement agreement.

3.  Whether the circuit court erred in awarding Lori attorney fees and costs.

4.  Whether the circuit court erred in setting the conditions of bond pending appeal.

---

2.   Although the record reflects that the court held two hearings on James's motion, the appeal record does not contain transcripts of those proceedings.

## Standard of Review

[¶19.] A circuit court's findings of fact will not be set aside unless clearly erroneous. *Keller v. Keller*, 2003 S.D. 36, ¶ 8, 660 N.W.2d 619, 622 (per curiam). When considering a court's order of contempt, "[t]he appropriate remedy or punishment for contempt of court lies within the sound discretion of the trial court" and is therefore reviewed for an abuse of discretion. *Id.* However, we review a court's conclusions of law de novo. *Harsken v. Peska*, 2001 S.D. 75, ¶ 9, 630 N.W.2d 98, 101.

## Analysis and Decision

### 1. *Whether the circuit court erred in holding James in contempt.*

[¶20.] The court entered a judgment and order of contempt on August 8, 2018, based on James's violation of the following: the January 27, 2014 judgment and decree of divorce; the May 1, 2017 findings of fact and conclusions of law; the June 1, 2017 order requiring both parties to cooperate with the accounting ordered by the court; and the October 11, 2017 order restraining further expenditures. James does not challenge any particular finding of fact entered in support of the August 2018 contempt order or the court's determination that he owes Lori $331,184.81 as a result of his contemptuous actions.[3] Nor does James dispute his

---

3. James did not order a transcript of the 2018 evidentiary hearing. It is well settled that "[w]here the record contains no transcript, the record on appeal is confined to those pleadings and papers transmitted from the circuit court[,]" and "our presumption is that the circuit court acted properly." *Graff v. Children's Care Hosp. and Sch.*, 2020 S.D. 26, ¶ 16, 943 N.W.2d 484, 489 (quoting *Baltodano v. N. Cent. Health Servs., Inc.*, 508 N.W.2d 892, 894–95 (S.D. 1993)).

knowledge of the court's orders, his ability to comply, or his willful and contumacious disobedience. Rather, on appeal, James advances the narrow issue that the court's contempt finding is invalid to the extent that it relies on the court's May 2017 findings of fact and conclusions of law.

[¶21.] "The required elements for a finding of civil contempt are (1) the existence of an order; (2) knowledge of the order; (3) ability to comply with the order; and (4) willful or contumacious disobedience of the order." *Keller*, 2003 S.D. 36, ¶ 9, 660 N.W.2d at 622 (quoting *Harsken*, 2001 S.D. 75, ¶ 12, 630 N.W.2d at 101). We have often stated that "[t]o form the basis for a subsequent finding of contempt, an order must state the details of compliance in such clear, specific and unambiguous terms that the person to whom it is directed will know exactly what duties or obligations are imposed upon [the person]." *Taylor v. Taylor*, 2019 S.D. 27, ¶ 39, 928 N.W.2d 458, 471 (quoting *Keller*, 2003 S.D. 36, ¶ 10, 660 N.W.2d at 622).

[¶22.] Here, after a hearing on Lori's July 2016 motion for an order to show cause, the circuit court entered detailed findings of fact and conclusions of law regarding James's violations of several provisions in the Agreement. For example, James distributed $114,202 to himself and made a distribution of approximately $2,000 to his management company, RCC, from the sale proceeds of a Lakota Lake property, rather than first satisfying existing debts. He also exceeded the annual expense caps for managing the properties and paid for his management fees with sources other than the proceeds from land sales. To remedy these violations, the court set forth several directives in its conclusions of law. The court directed James

to pay Lori her equal distribution of $60,678 from the proceeds of a Lakota Lake property sale "within 90 days of the date of the entry of *this Order*." (Emphasis added.) The court further required James to provide information to the various companies' accounting firm, to "make all financial information accessible to Lori upon request and immediately after the request is made," and to allow Lori equal access to the parties' cabin. Finally, the court directed that "[n]either party has a right to encumber, sell or dispose of [the assets owned by Lakota Lake and RCRC] except as set forth in the Stipulation and Agreement in this action."

[¶23.]    James does not dispute that the circuit court's May 2017 directives were clear, specific, and unambiguous or that he was aware of them. His formulaic argument that that the court's findings of fact and conclusions of law cannot serve as an "order" for the purpose of contempt is unconvincing. Even though the court did not file a separate document captioned as an "Order" or include the term "Order" in the caption of its May 2017 findings and conclusions, SDCL 15-6-58 provides that an order becomes "effective when reduced to writing, signed by a court or judge, attested by the clerk and filed in the clerk's office." There is no question that the circuit court's May 2017 findings of fact and conclusions of law were reduced to writing, signed by the judge, attested by the clerk, and filed, and it is apparent that the court expected James to comply with these mandates.

[¶24.]    More importantly, James's argument challenging the basis for the court's finding that he ignored orders of the court disregards the breadth of the court's ultimate ruling. The court not only found James in violation of the May 2017 directives, but also found that he violated the parties' initial Agreement

incorporated in their divorce decree and the court's additional detailed orders entered between May 2017 and August 2018.[4] Because the record reflects that James was fully aware of these multiple orders, we affirm the circuit court's decision to hold him in contempt.

### 2. Whether the circuit court's judgment and order of contempt improperly modified the parties' property settlement agreement.

[¶25.]    James advances multiple arguments in support of his claim that the circuit court improperly modified the parties' Agreement in its judgment and order following the contempt proceedings. He contends that the court improperly readjudicated the parties' property rights under the Agreement to punish him for his contemptuous acts. He further claims that the circuit court had no legal basis to order him to convey title to real property owned by the various limited liability companies in which he held an ownership interest. While James agrees that the parties' *interests* in the legal entities are marital assets, he maintains that the *assets* owned by these various legal entities are not, and therefore, Lori's only remedy in this case is a money judgment against James that she could then execute upon James's distributional interests in the limited liability companies.

[¶26.]    Notably, James does not challenge the circuit court's determination that he violated the parties' Agreement or that he owes Lori $331,184.81. Nor does

---

4.    Throughout the contempt proceedings, James continued his pattern of refusing to give Lori access to financial information and continued to deny her access to the cabin. James also unilaterally withdrew $17,500 from the cabin bank account and transferred $4,200 to other company accounts, which left insufficient funds to pay the mortgage and monthly expenses for the cabin. In addition, he encumbered Lakota Lake's assets in violation of the court's directives.

James dispute that the objective of the parties' Agreement was to allow James to sell the remaining properties so that the sale proceeds could be divided equally. In fact, both parties proposed a division of the remaining land assets in their pretrial submissions and presented evidence at a three-day hearing for the specific purpose of valuing these assets so the court (at their request) could distribute them in accord with their Agreement. Nevertheless, James now disputes that he ever agreed to divide the remaining unsold assets and insists that the court impermissibly modified the parties' Agreement.

[¶27.]     "The long-standing law of this State is 'that the division of property pursuant to a divorce decree is not subject to modification.'" *Hiller v. Hiller*, 2015 S.D. 58, ¶ 12, 866 N.W.2d 536, 541 (quoting *Sjomeling v. Sjomeling*, 472 N.W.2d 487, 489 (S.D. 1991)). This is because "[a] property division in a divorce action is designed to settle with finality the property rights of the parties as of the entry of judgment, and each party is entitled to their respective property as of that date." *Sjomeling*, 472 N.W.2d at 490. However, "[t]he division of marital property is an equitable action by the court." *Id.* (citing SDCL 25-4-44). Therefore, "as a general rule, courts retain jurisdiction to make such further orders as are appropriate to compel compliance with its judgment." *Id.; accord Hiller*, 2015 S.D. 58, ¶ 12, 866 N.W.2d at 541 (noting that a court may "enter an order enforcing or clarifying the divorce decree"). Because of the different manner in which the court addressed each of the various properties in its contempt order, we analyze each property interest separately.

## The Cabin Property

[¶28.]    The Agreement recognized that at the time of the divorce, James and Lori "jointly own" the cabin property and that a mortgage exists on the property. As part of the property settlement, the parties agreed to sell the cabin property, apply the proceeds to satisfy the mortgage and any expenses of the sale, and then divide the remaining proceeds equally. The Agreement further provided that in the interim, James "agrees to continue to manage the cabin including marketing, leasing and taking care of all maintenance issues to maximize the rental of the cabin" and that he would receive $500 a month for his management services to be paid from the proceeds of the cabin rental income.

[¶29.]    At the time of Lori's 2016 motion for an order to show cause, the parties had not sold the cabin property. The record further reveals that James repeatedly denied Lori access to the cabin and refused to provide her financial information relating to his management of the cabin. While the circuit court attempted, in multiple hearings and orders, to facilitate the terms of the parties' Agreement with respect to the management and sale of the cabin property, the corrosive relationship between the parties made that task impossible. The court therefore entered an order in October 2017 that Lori assume management of the cabin and that James provide Lori access to all intellectual property and marketing materials. The court further directed that the cabin be listed for sale. However, because it had not been sold by the January 2018 evidentiary hearing, the court valued the equity in the cabin property and divided that value equally between the parties. The court further ordered that James convey his right, title, and interest in

#28721

the cabin property to Lori and made Lori solely responsible for the mortgage on the property.

[¶30.] James first contends the circuit court impermissibly modified the Agreement when the court stripped him of his management duties with respect to the cabin. On the contrary, nothing in the Agreement guaranteed James an irrevocable right to manage the property until it sold, particularly if he was not abiding by the directives in the Agreement or the court's subsequent orders with respect to the management and sale of the cabin. More importantly, a right to manage property is not equivalent to a vested right to hold title to property and is certainly something over which a court retains the equitable power to modify in a contempt proceeding where the marital asset at issue is being mismanaged.

[¶31.] James next contends that the court impermissibly modified the Agreement by awarding sole ownership of the cabin property to Lori. We disagree. First, the Agreement did not vest title to the cabin property in either party. Second, rather than valuing the cabin property and awarding it to either party, the Agreement contemplated that this property would be sold and the parties would share the proceeds equally. Because the court awarded James half the value of the cabin property and credited his equal share against his monetary obligation to Lori arising from his contemptuous conduct, the court's treatment of this marital property was in accord with the parties' Agreement. *See, e.g.*, *Hisgen v. Hisgen*, 1996 S.D. 122, ¶¶ 9–10, 554 N.W.2d 494, 498 (upholding the circuit court's modification of the method by which wife would receive one-half of husband's gross annuity payments under the divorce decree).

-15-

## Equity 40-acre Parcel

[¶32.]     The Agreement identified that Lori owns the Equity Institutional pension plan and that it holds one 40-acre parcel. Following the January 2018 evidentiary hearing, the court valued this property, divided the value equally, and ordered James to execute a release and assignment relinquishing his ownership interest in the property. Similar to the cabin property, the Agreement did not value this 40-acre parcel or vest title to the parcel in either party. Instead the parties agreed to sell the land and divide the proceeds equally. Therefore, the court did not impermissibly modify the Agreement when it valued the unsold parcel, applied James's one-half share of the value of this property toward his monetary obligation to Lori stemming from the court's contempt finding, and awarded the parcel to Lori.

## Red Canyon Rim Company (RCRC)

[¶33.]     The Agreement describes that "Red Canyon Rim Company was created to transfer ownership of the jointly owned land which is now owned by the Rim, LLC . . . to minimize the tax consequences from the sale of the property." At the time of the divorce, this jointly owned land consisted of 230 acres, but by the time of the January 2018 evidentiary hearing, only one 10-acre lot remained. James owns 80% of the outstanding capital stock of RCRC and is its president and CEO. The Agreement provides that James "will retain ownership of his interest in the Red Canyon Rim Company" but "the parties will share equally the assets and liabilities of Red Canyon Rim Company."

[¶34.]     While the remaining 10-acre lot is an asset of RCRC, the company carries a liability in the form of a note in favor of James and Lori, initially issued for

$3,250,000 and secured by a guaranty and mortgage. In the Agreement, James and Lori agreed to accept "a reduced payment less than the original amount of $3,250,000" as reflective of "the market sale conditions[.]" A balance sheet for RCRC, admitted as an exhibit at the January 2018 hearing, listed the December 31, 2016 value of this note at $160,000. After the January 2018 hearing, the court valued the 10-acre lot to which this note would be attached at $116,000.

[¶35.]    Contrary to any suggestion otherwise by James, the circuit court's judgment and contempt order did not divest James of his 80% ownership of the outstanding capital stock of RCRC; nor did the court's order direct that property owned by RCRC be transferred to Lori. Instead, the court directed James to assign to Lori his entire interest in the *note* RCRC owed to the parties jointly, and James has not specifically alleged that this constituted an impermissible modification of the Agreement. Moreover, the court's contempt order credited James for his equal share of the value of the RCRC property secured by this note, thus ensuring that James realized the value of his equal interest in this asset consistent with the Agreement.

IMTC

[¶36.]    The Agreement identified that James and Lori "own 77% of the membership interest" of IMTC. It further identified that IMTC's primary asset is a one-acre parcel of land "which is currently offered for sale[.]" The Agreement provided that the parties "will continue as equal owners of the 77% until the land is sold at which time the proceeds will be divided equally." At the time of the January 2018 evidentiary hearing, the one-acre parcel had not sold, so the court valued the

parties' 77% interest in the property at $57,070 and credited James for one-half of that value. Rather than transferring title to this property held by IMTC to Lori, the court ordered James to transfer his ownership interest in IMTC to Lori "free and clear of all liens, claims and encumbrances." The court further ordered James to resign as managing member of IMTC.

[¶37.] James argues that the court exceeded its authority in entering these orders, but we disagree. The parties' joint ownership interest in IMTC as related in the Agreement referred to an end date. James and Lori were to continue as joint owners of the 77% interest *"until the land is sold*[.]" (Emphasis added.) Notably, there is no language in the Agreement relating how the parties' membership interests in IMTC were to be divided after a sale of the company's primary asset. But as the record demonstrates, it became clear that James's noncompliance with various provisions in the Agreement warranted a remedy that could only be accomplished by modifying the method of dividing the marital assets, including this one.

[¶38.] Under SDCL 25-4-42, "[t]he court may require a spouse to give reasonable security for providing maintenance, or making any payments required under the provisions of this chapter, and may enforce the same by the appointment of a receiver, or by *any other remedy applicable to the case*." (Emphasis added.) Here, the Agreement did not value the parties' joint interests in IMTC, or any of the other marital property at issue; nor did it provide an alternative method of dividing the parties' joint interests in the event the aforementioned sales did not occur or if discord between the parties made such sales unlikely. Therefore, the court retained

the authority to enforce the parties' stated intention to equally divide their property given the circumstances that later arose.

[¶39.] In many respects, the equitable power exercised by the court to remedy James's contempt and ensure Lori receives that to which she is entitled under the Agreement is comparable to the circuit court's acceleration of the debt owed in the *Sjomeling* case. *See* 472 N.W.2d at 490. In *Sjomeling*, the husband was ordered to pay the wife a property settlement adjustment in installments pursuant to the divorce decree. The husband failed to pay the first installment, and the wife filed a motion for an order to show cause. After a hearing, the court ordered the husband to make the past-due property settlement payment within sixty days. When the husband failed to do so, the court accelerated the debt. On appeal, the husband argued that in doing so, the court impermissibly modified the property settlement. We disagreed, concluding that the court "in no manner modified the division of the marital property; it merely modified the *method of distribution* of the property settlement adjustment." *Id.* (emphasis added). Relying on SDCL 25-4-42, we noted that the court's decision to accelerate the debt was "a remedy applicable to the case." *Id.* We further recognized that "[h]ad the debt not been accelerated, [the wife] may have had to repeatedly petition the court to order [the husband] to comply with the parties' agreement." *Id.*

[¶40.] So too here, the court did not impermissibly modify the Agreement when it became clear that James's noncompliance with various provisions in the Agreement warranted a modification of the method of distribution of the marital property. The court, at the parties' request, accelerated the equal division of

marital property that would have otherwise occurred if the property had sold. With respect to the IMTC property, the court assigned a value to the company's primary asset as if it had sold, determined each party's equal share of 77% of this value as contemplated by the Agreement, and credited James's equal share toward the sum the court determined he owed Lori for his contemptuous acts. In order for Lori to realize her one-half value of the parties' membership interest in this asset, the court ordered James to resign as managing member and transfer his half of the membership interest to Lori. This remedy places the parties in the same financial position as if the company's asset had been sold and the proceeds divided as contemplated under the Agreement.

### Lakota Lake

[¶41.]        The Agreement relates that the parties "are the majority owners of [Lakota Lake] with approximately 80% membership interest between them." James's management company, RCC, held an 11.65% interest in Lakota Lake, and the remaining interests were held by other members. The parties agreed that RCC (James) could be paid $5,000 per month for his management of Lakota Lake until December 21, 2015, *from future land sales*. The Agreement indicates that Lakota Lake "consists of residential real estate lots to be sold as the following tracts: Big Granite, Granite Perch, and Hole in Rock." The Agreement notes that another tract—Shelter Rock—recently sold and that the net proceeds would be used to offset operating costs including fees to James's management company, RCC. Further, the net proceeds from the sale of all remaining tracts were to first be used to satisfy

certain contractual debts, then for other operational costs, and finally issued as disbursements in accord with the membership interests on record.

[¶42.] During the course of the contempt proceedings, the court found that although the parties sold the "Shelter Rock" tract for $86,000, James did not account for $25,000 held in escrow after the sale and did not distribute to Lori her equal share. The court further determined that James failed to provide Lori access to Lakota Lake's financial information, causing her to incur attorney fees in making an official demand.

[¶43.] In regard to the sale of the "Hole in Rock" tract, the court found that James did not first satisfy the debt obligations as required by the Agreement but instead distributed sale proceeds to himself and his management company. The court also found that contrary to the provisions in the Agreement, James exceeded the annual expense limits for maintaining the Lakota Lake tracts. In addition, James did not pay his management fees from future land sales as required in the Agreement. Finally, the court found that James, as the managing member of Lakota Lake, "violated the nature and spirit of the" Agreement and "essentially depleted all available funds needed to pay on-going expenses for Lakota Lake, requiring Lakota Lake to borrow money."

[¶44.] At the time of the court's August 2018 judgment, "Big Granite" and "Granite Perch" had not yet sold, and Lori's share of the parties' 80% interest in Lakota Lake had been diminished because James instituted a cash call in February 2014 immediately after the parties' divorce. Because James was the only member who made a cash contribution, the cash call diluted all other members' interests,

including Lori's. Nevertheless, the court found that regardless of James's and Lori's respective membership interests in Lakota Lake, the Agreement required that they share equally in any distributions made to each other or to RCC.

[¶45.]    In its August 2018 judgment and contempt order, the circuit court accordingly valued the two remaining Lakota Lake tracts and divided that value equally between the parties. The court then ordered James to take certain actions related to the Big Granite tract in his capacity as managing member of Lakota Lake and officer of RCC so that Lori would ultimately obtain ownership of this property. In particular, the court's order required James to "take all action and execute all documents . . . necessary to approve a distribution to the members of Lakota [Lake]" as follows:

> Lakota shall . . . convey title to the Big Granite Property to
> [James] individually free and clear of any rights, encumbrances
> or restrictions, and [James] shall, in his capacity as operating
> manager of RCC, managing member of Lakota [ ]make
> distributions of cash or property to the other members of Lakota
> as may be necessary to comply with the distribution obligations
> of Lakota as set forth in Lakota's operating agreement or as
> otherwise required by law. [James] shall execute and deliver a
> warranty deed transferring the ownership of Big Granite
> Property to [Lori] . . . free and clear of any rights, encumbrances
> or restrictions.

[¶46.]    On appeal, James does not assert that he was without authority under Lakota Lake's operating agreement to take the specific actions ordered by the court. Rather, he argues that the court erred in conveying title to the real property because the legal entities holding title to those assets are indispensable parties who were not joined in this action, and thus, the court had no authority to require a non-party legal entity to transfer Big Granite (albeit indirectly) to *Lori*. In his view,

Lori's only remedy under SDCL 47-34A-504 as a judgment creditor of James's distributional interests in various LLCs is to "seek to execute upon [James's] ownership interest in the various liability companies that own parcels of real property." We reject James's argument for a number of reasons.

[¶47.] First, James himself proposed a division of property wherein the court would award him the two remaining Lakota Lake tracts. Notably, he did not argue that the other minority members of Lakota Lake are indispensable parties to all actions involving the transfer of the company's assets until after the court issued its findings and conclusions and Lori proposed a judgment in accord with the court's ruling. Moreover, James has not identified how any of these members' interests would be harmed by the transfers ordered by the court. Second, it is clear under Lakota Lake's operating agreement that James, as the managing member, has the exclusive authority to dispose of company assets and thus convey Big Granite to whomever he chooses so long as he makes other necessary distributions to the rest of the Lakota Lake members. The court's order here was consistent with these provisions in the operating agreement.

[¶48.] Finally, contrary to James's characterization of the transactions at issue, the circuit court did not order James to facilitate a transfer of Big Granite from Lakota Lake to *Lori*.[5] Rather, the court ordered James "in his capacity as an officer of RCC, the managing member of Lakota [Lake,]" to facilitate the transfer of

---

5. Given the dilution of Lori's interest in Lakota Lake to a mere 5.7% after the cash call orchestrated by James shortly after the divorce, it was likely impossible to accomplish a direct transfer to Lori of the entire property in this manner.

the property to *himself*, and after doing so, James would become the owner of Big Granite. Because James would own Big Granite in his individual capacity after this distribution, he could then transfer the property to Lori as ordered by the court, and Lori would not have to satisfy her judgment against James through a lien on his distributional interest in the limited liability company as contemplated by SDCL 47-34A-504.

[¶49.] We also disagree with James's further argument that in transferring the Lakota Lake property, the court erroneously modified the parties' property settlement. While the court certainly modified the method of distribution of this marital property, the court did not modify the equal division of the property required by the Agreement. Importantly, the record reflects that modifying the method of distribution was necessary in this case to prevent James from further dissipating the value of Lori's interest in the Lakota Lake property in a manner that benefited only James.[6] Therefore, we conclude that the court's actions were taken in accord with its equitable power to remedy James's contempt, while at the same time enforcing the underlying objectives of the parties' property settlement as set forth in the Agreement and incorporated in their divorce decree.

[¶50.] In affirming the circuit court's orders relating to all the property interests at issue, we specifically reject James's assertion that the circuit court's

---

6. For example, the court found that James made distributions to himself and his management company instead of paying down debts as required under the Agreement. James also "essentially depleted all available funds needed to pay on-going expenses for Lakota Lake[.]" He also encumbered Lakota Lake by securing a note for $60,000, and then took approximately $15,000 of that note for his personal use.

actions here are similar to those found impermissible in *Hiller*, 2015 S.D. 58, 866 N.W.2d 536 and *Hanisch v. Hanisch*, 273 N.W.2d 188 (S.D. 1979). In *Hiller*, the husband (Hiller) was awarded title to specific property in the divorce decree. 2015 S.D. 58, ¶ 4, 866 N.W.2d at 538. He was also ordered to make a cash equalization payment to the wife and use his "best efforts" to remove his wife from the liabilities, but he was not able to accomplish this because he could not secure refinancing on the property. Hiller's ex-wife then filed a motion requesting that the court order Hiller to sell the property, which the court granted in order to relieve Hiller's ex-wife of her marital debt obligations and enable Hiller to pay the cash equalization sum.

[¶51.] On appeal, we reversed the circuit court's order because the divorce decree vested title to the property in Hiller and the forced sale materially changed the equitable division of marital property. *Id.* ¶¶ 14, 26, 866 N.W.2d at 541–42, 544. Further, we noted that unlike in *Sjomeling*, Hiller's ex-wife did not file a motion for an order to show cause or present evidence that Hiller failed in any respect to comply with the terms of the divorce decree. *Id.* ¶¶ 14, 17, 866 N.W.2d at 541–42. In the Court's view, the circuit court erroneously treated Hiller as if he was in contempt and exceeded its power to enforce the provision in the parties' property division. *Id.* ¶¶ 17–18; 866 N.W.2d at 542–43.

[¶52.] Here, however, the court was presented with a contempt motion, and after finding James in contempt, the court entered orders to compel his compliance with the Agreement and with the court's directives issued in the course of the contempt proceedings. The court's order here is more closely aligned with what

occurred in *Sjomeling* and unlike the order at issue in *Hiller* because it did not divest James of property that had been awarded to him under the parties' Agreement. Instead, the court accomplished the equal division of property that would have otherwise occurred upon anticipated sales, albeit in a different manner.

[¶53.]     *Hanisch* is also distinguishable. *See* 273 N.W.2d 188. While *Hanisch* did involve a finding of contempt, the issue before the court was the husband's failure to pay child support and whether the court's contempt order went beyond a modification of the *method of distribution* of a property division. To punish the husband for his contemptuous acts unrelated to the property division, the court divested him of his interest in the marital home. On appeal, we noted that "[i]t is undisputed in the present case that the [husband's] title and interest in the house are property rights, and it is also undisputed that said rights were determined in the decree[.]" *Id.* at 190. We thus held that the circuit court erred when it readjudicated the husband's property rights "to punish [him] for contempt." *Id.* at 191.

[¶54.]     We often state that property divisions are designed to give finality to the parties. *See, e.g., Sjomeling*, 472 N.W.2d at 490. But this is true only if the property division finally settled the parties' property rights. Here, although the Agreement provides that parties will equally share proceeds from the sale of the various properties, the parties employed terms that were contingent on future events (i.e., the sale of marital assets) and these events did not materialize as anticipated. Moreover, the open-ended property settlement agreement became further problematic because James repeatedly violated the terms of the Agreement

in a manner that depleted the assets available to Lori. He also repeatedly violated the court's specific orders issued to compel his compliance and give finality to the parties' Agreement. Finally, despite his claims now to the contrary, both James and Lori requested that the court value and divide the remaining assets in order to resolve the contempt motion, and the court held a three-day hearing to facilitate their request. Therefore, James can hardly complain now about the court imposing this very remedy.

### 3. Whether the circuit court erred in awarding Lori attorney fees and costs.

[¶55.] James contends the circuit court erred in awarding Lori attorney fees and costs because the award was based on fees incurred in obtaining an improper modification of the Agreement and on his violation of a non-existent order. James has not advanced any other challenge to the court's findings with respect to this fee award. Because the circuit court did not err in finding James in contempt or in modifying the method by which the parties would receive their equal share of the marital assets under the Agreement, we affirm the court's award.

### 4. Whether the circuit court erred in setting the conditions of bond pending appeal.

[¶56.] James argues that the circuit court failed to properly apply SDCL 15-26A-27 and SDCL 15-26A-29 when setting the conditions of his appeal bond. The circuit court entered its order setting conditions of bond and staying execution on September 6, 2018. While James filed an objection *in circuit court* to this bond order on September 7, 2018, he did not include a challenge to the bond conditions in *his appeal to this Court*, filed the same day, from the circuit court's August 2018

contempt order and judgment. Moreover, the circuit court thereafter held proceedings related to the appeal bond[7] and entered its final order on this issue in March 2019. James filed a separate appeal challenging the bond order, which we dismissed because he failed to serve and file an appellant's brief. James cannot now revive that dismissed appeal here.

[¶57.]     James, however, claims that under SDCL 15-26A-7, the court's September 2018 bond order "is subject to review on appeal from the circuit court's final judgment entered August 8, 2018." We disagree. Under SDCL 15-26A-7, "[o]n appeal from a judgment the Supreme Court may review any order, ruling, or determination of the trial court . . . whether any such order, ruling, or determination is made before or after judgment *involving the merits and necessarily affecting the judgment* and appearing upon the record." (Emphasis added.) A reversal or modification of the circuit court's September 2018 order setting conditions of bond on appeal would not affect the merits of the court's contempt judgment. *See Lang v. Burns*, 77 S.D. 626, 631, 97 N.W.2d 863, 866 (1959) (denying review of a decision on motion to add parties because the decision did not necessarily affect the judgment on appeal). Therefore, we decline to address the

---

7.     Although James did not challenge the bond order in his notice filed for *this* appeal, he filed a motion for special relief from this Court under SDCL 15-26A-39 requesting that this Court enter an order approving his proposed bond conditions and staying enforcement of the circuit court's judgment. On October 19, 2018, we issued an order denying James's request for special relief, but granted a motion filed by Lori for a limited remand to have James's attorney held in contempt for failing to provide the signed instruments of conveyance to Lori's counsel as required by the existing bond order. The circuit court held further hearings and entered separate orders holding James's attorney in contempt and denying James's motion to reconsider the circuit court's bond conditions.

circuit court's bond order in the present appeal of the court's judgment and order of contempt.

### *Appellate Attorney Fees*

[¶58.] Lori requests an award of $29,172.62 in appellate attorney fees. Under SDCL 15-26A-87.3, appellate attorney fees may be awarded "only where such fees are permissible at the trial level." *Charlson v. Charlson*, 2017 S.D. 11, ¶ 36, 892 N.W.2d 903, 913 (quoting *Lord v. Hy-Vee Food Stores*, 2006 S.D. 70, ¶ 35, 720 N.W.2d 443, 445). Attorney fees are permitted in divorce cases under SDCL 15-17-38, and given our review of the record, we award Lori the $29,172.62 she requests here.

[¶59.] Affirmed.

[¶60.] GILBERTSON, Chief Justice, and KERN, JENSEN, and SALTER, Justices, concur.